NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3357-12T3

BRIAN ROYSTER,

    Plaintiff-Respondent,

v.

NEW JERSEY STATE POLICE and
JOSEPH R. FUENTES,

    Defendants-Appellants,

and

OFFICE OF THE ATTORNEY GENERAL,
MARSHALL BROWN, TIMOTHY GOSS,
THOMAS GILBERT, KENNETH ROWE,
PATRICK REILLY, ALAN TERPANICK,
DEBORAH EDWARDS, D.A.G., DAVID
ROSENBLUM, D.A.G., ALFRED RAMEY,
A.A.G., AUSTIN O'MALLEY, PETER VAN
IDERSTINE, STEPHEN SERRAO, WILLIAM
LUCAS, MARSHALL CRADDOCK, DAVID
JONES, and MARK DOYLE.

    Defendants.

---

> **APPROVED FOR PUBLICATION**
>
> **March 10, 2015**
>
> **APPELLATE DIVISION**

Argued February 3, 2015 — Decided March 10, 2015

Before Judges Yannotti, Fasciale and Whipple.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-7033-05.

Ralph R. Smith, 3rd, argued the cause for appellants (Capehart Scatchard, P.A.,

attorneys; Mr. Smith and Kelly E. Adler, on the brief).

Michael J. Reimer argued the cause for respondent.

The opinion of the court was delivered by

FASCIALE, J.A.D.

The New Jersey State Police (NJSP) and Colonel Joseph R. Fuentes (collectively "defendants") appeal from a judgment in plaintiff's favor entered after a jury trial adjudicating plaintiff's claims under the Americans with Disabilities Act (ADA), 42 U.S.C.A. §§ 12101 to 12213, and the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14.

Defendants argue primarily that plaintiff's ADA claim —— that they failed to accommodate his medical condition —— is precluded by the doctrine of state sovereign immunity. Defendants also contend that the judgment on plaintiff's CEPA claim must be vacated because plaintiff failed to establish a prima facie case of a CEPA violation and because the judge committed numerous trial errors.

We hold that the doctrine of state sovereign immunity precludes plaintiff's ADA claim, even though defendants did not fully raise that argument until their motion for a judgment notwithstanding the verdict (JNOV). As a result, we vacate that part of the judgment awarding plaintiff damages under the ADA

and dismiss the ADA claim with prejudice.

We reject defendants' arguments that plaintiff's job responsibilities precluded him from making a CEPA claim and that plaintiff failed to produce sufficient evidence for the jury to consider plaintiff's CEPA allegations. However, we vacate the CEPA judgment and remand for a new CEPA trial on liability and damages because we are convinced that the entire CEPA verdict is fatally flawed.

## I.

The NJSP employed plaintiff, who is African American, from 1986 until he retired in 2011. From 1986 to 1993, plaintiff worked as a trooper. Beginning in 1993, plaintiff worked as a detective in the Central Security Unit. In or around October 2001, plaintiff interviewed for a position in the Equal Employment Opportunity/Affirmative Action Unit (the "EEO/AA Unit"). Plaintiff did not get the job.

In January 2002, the NJSP promoted plaintiff to detective sergeant. In general, the NJSP permitted sergeants to be assigned to another unit without requiring them to participate in a formal interview process. In late 2002, plaintiff took advantage of this opportunity and, when there was an opening in the EEO/AA Unit, he obtained an assignment there without submitting to another interview.

Sometime around November 2003, plaintiff began a four-month medical leave of absence due to ulcerative colitis.[1] In December 2003, while still on medical leave, plaintiff met with Fuentes to convey his belief that he had been passed over for a promotion. Plaintiff also expressed his general concerns that the EEO/AA Unit failed to timely investigate matters and that the NJSP generally disciplined African American troopers more severely than white troopers. In March 2004, plaintiff returned to work from his medical leave.

Plaintiff was eligible for a promotion on April 13, 2004. Two days later, plaintiff's supervisor (the "supervisor") prepared a confidential memorandum (the "memo") reporting to Fuentes three instances of plaintiff's purported unprofessionalism. The supervisor indicated essentially that plaintiff tried to obtain a "promotion by extortion."

In August 2004, the supervisor provided an addendum to the memo supplying additional examples of alleged unprofessional conduct by plaintiff. In October 2004, the NJSP substantiated one of the allegations, that plaintiff failed to disclose the reason for requesting removal as an investigator on an unrelated matter, but was unable to substantiate the remaining

---

[1] Ulcerative colitis is an inflammatory disease of the colon. 16 Attorneys Textbook of Medicine ¶ 231.50 (3d ed. 2015).

allegations. The NJSP then removed plaintiff from the EEO/AA Unit in May 2004.

From May 2004 to September 2005, plaintiff worked in the NJSP Counter-Terrorism Unit (the "CTU"). In September 2005, he moved to the Organized Crime Unit North (the "OCU North") where he performed administrative work. In October 2006, the NJSP assigned plaintiff to do surveillance in a vehicle, which plaintiff maintained deprived him of constant access to a restroom, a requirement necessitated by his medical condition. From June 2007 to February 2008, the NJSP re-assigned plaintiff to other tasks within the OCU North, where he had constant access to a restroom.

In March 2008, the NJSP transferred plaintiff to the Solid Hazardous Waste Unit (the "SHW Unit"), and in May 2009, the NJSP promoted plaintiff to a detective sergeant first class ("DSFC"). In his new position at the SHW Unit, plaintiff had immediate access to a restroom. In February 2011, plaintiff retired from the NJSP having reached the rank of DSFC.

Plaintiff filed his initial complaint against defendants and numerous other parties (the "other parties"), contending primarily that the NJSP failed to timely promote him. He maintained that had he achieved a higher rank, he would have earned more money, thereby giving him a greater pension. He

also asserted that the NJSP failed to accommodate his ulcerative colitis by assigning him to a position doing vehicle surveillance where he was without constant access to a restroom.

Plaintiff amended his complaint on four occasions. The court dismissed the second amended complaint[2] pursuant to Rule 4:6-2(e), but we reversed that order and remanded for further proceedings. Royster v. N.J. State Police, No. A-1423-06 (App. Div. Dec. 20, 2007). On remand, the parties engaged in discovery and prepared for trial.

At the close of plaintiff's case-in-chief, plaintiff's counsel elected to waive plaintiff's NJLAD claims, pursuant to the CEPA waiver clause contained in N.J.S.A. 34:19-8.[3] The court subsequently dismissed the NJLAD claims, leaving plaintiff's ADA

---

[2] In the second amended complaint and thereafter, plaintiff asserted claims for (1) a hostile work environment under the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -42; (2) a "hostile work environment and disparate treatment as to promotions and transfers"; (3) a "state constitutional claim"; (4) "CEPA and constitutional claims"; (5) "retaliation, filing spurious charges and specifications"; (6) sexual harassment; (7) discrimination and retaliation under the ADA and the NJLAD; (8) "patterns of discrimination, hostile work environment and violations of constitutional rights and CEPA"; and (9) a "hostile work environment and refusal to conduct investigations of wrongful behavior."

[3] This clause requires a plaintiff to waive "the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J.S.A. 34:19-8.

and CEPA claims against defendants for the jury's sole consideration.[4]

Prior to summations, the court heard brief arguments on whether defendants had waived their ADA arguments or defenses.[5] The court stated that "plaintiff has gone [to the] trouble of trying the entire case . . . I'm not prepared to rule on any of that at this time."

The jury returned a verdict in plaintiff's favor finding that defendants violated the ADA and CEPA. On plaintiff's ADA claim, the jury awarded plaintiff $500,000 for emotional distress.[6] On the CEPA claim, the jury awarded plaintiff $55,000 in lost wages, $305,000 in lost pension benefits, and $200,000 for mental anguish and emotional distress. The judge then added pre-judgment interest on the CEPA damages, and entered judgment in plaintiff's favor in the amount of $895,548.12.

Defendants moved for JNOV, or in the alternative, for a new trial or a remittitur (the "post-trial motion"), arguing that the court "lacked subject matter jurisdiction" to adjudicate the

---

[4] The claims against the other parties were dismissed at various stages of the proceedings.

[5] The record is unclear as to which ADA defenses were being raised at this time.

[6] The judge capped this amount at $300,000 pursuant to 42 U.S.C.A. § 1981a.

ADA claim because defendants were immunized under the doctrine of state sovereign immunity. The judge denied defendants' motion in its entirety and held that defendants were estopped from moving to dismiss plaintiff's ADA claim after the jury's verdict.

On appeal, defendants argue that (1) they are immune from liability under the ADA pursuant to the doctrine of state sovereign immunity; (2) the judge erred in applying the wrong definition of "disabled" and usurping the role of the jury by finding that plaintiff was disabled under the ADA; (3) plaintiff's ADA claim is procedurally deficient because he failed to exhaust administrative remedies; (4) plaintiff's job duties precluded him from bringing a CEPA claim; (5) plaintiff failed to establish a prima facie case of a CEPA violation; (6) plaintiff's CEPA damages award should be vacated because the jury considered irrelevant evidence in making its calculations; and (7) the judge committed numerous other trial errors.

## II.

We begin by addressing defendants' contention that the doctrine of state sovereign immunity immunizes them from liability under the ADA. Defendants maintain that the judge erred by concluding that they were estopped from making the argument in their post-trial motion. Equating state sovereign

immunity with the principles of subject matter jurisdiction and the protections afforded by the Eleventh Amendment to the United States Constitution, defendants contend that they can raise a state sovereign immunity defense at any time.

A.

At the outset, we note that defendants conflate the rules of protection under the Eleventh Amendment, state sovereign immunity, and subject matter jurisdiction. While these legal principles may be interrelated, they are distinct, and warrant brief discussion.

i.

It is well-recognized that states have enjoyed state sovereign immunity in federal courts under the Eleventh Amendment. "[T]he States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution." Alden v. Maine, 527 U.S. 706, 713, 119 S. Ct. 2240, 2246-47, 144 L. Ed. 2d 636, 652 (1999). After the United States Supreme Court allowed an out-of-state creditor to sue the state of Georgia in federal court on a debt, see Chisolm v. Georgia, 2 U.S. (2 Dall.) 419, 1 L. Ed. 440 (1793) (applying the plain text of U.S. Const. art. III, § 2, cl. 1), Congress adopted and the states ratified the Eleventh Amendment overruling Chisolm and "restor[ing] the

original constitutional design" of state sovereign immunity. Alden, supra, 527 U.S. at 722, 119 S. Ct. at 2251, 144 L. Ed. 2d at 658. The Eleventh Amendment has since been interpreted to prohibit a state from being sued in federal court by citizens of its own state, or citizens of a sister-state. Id. at 712-13, 119 S. Ct. at 2246, 144 L. Ed. 2d at 652; Hans v. Louisiana, 134 U.S. 1, 10-11, 10 S. Ct. 504, 505-06, 33 L. Ed. 842, 845-46 (1890).

There are two recognized exceptions to state sovereign immunity that could allow a state to be subject to suit in federal court despite its Eleventh Amendment protection. First, Congress may abrogate state sovereign immunity pursuant to its powers under the Fourteenth Amendment. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd., 527 U.S. 666, 670, 119 S. Ct. 2219, 2223, 144 L. Ed. 2d 605, 613 (1999). Second, a state can consent to be sued in federal court. Clark v. Barnard, 108 U.S. 436, 447-48, 2 S. Ct. 878, 883, 27 L. Ed. 780, 784-85 (1883). A state may make a "clear declaration" to submit itself to federal court jurisdiction, Coll. Sav. Bank, supra, 527 U.S. at 676, 119 S. Ct. at 2226, 144 L. Ed. 2d at 616 (citation and internal quotation marks omitted), or it can waive its immunity through its litigation conduct by removing a case to federal court thereby invoking federal court jurisdiction, Lapides v.

Bd. of Regents, 535 U.S. 613, 624, 122 S. Ct. 1640, 1646, 152 L. Ed. 2d 806, 816 (2002).

Federal Rule of Civil Procedure 12(b)(1) allows the filing of a "motion to dismiss for lack of subject matter jurisdiction because of state sovereign immunity." Meyers v. Texas, 410 F.3d 236, 240 (5th Cir. 2005), cert. denied, 550 U.S. 917, 127 S. Ct. 2126, 167 L. Ed. 2d 862 (2007). The United States Supreme Court permits states to make Eleventh Amendment arguments at any time. See Calderon v. Ashmus, 523 U.S. 740, 745 n.2, 118 S. Ct. 1694, 1697, 140 L. Ed. 2d 970, 977 (1998) (noting that the Eleventh Amendment "can be raised at any stage of the proceedings").

ii.

Although the Eleventh Amendment pertains to state sovereign immunity in federal court, it is well-established that states enjoy sovereign immunity from suit in their own courts and may define the scope of that immunity. See Alden, supra, 527 U.S. at 738, 119 S. Ct. at 2258, 144 L. Ed. 2d at 668 (indicating that "the immunity of a truly independent sovereign from suit in its own courts has been enjoyed as a matter of absolute right for centuries. Only the sovereign's own consent could qualify the absolute character of that immunity" (citation and internal quotation marks omitted)). Alden further held that because of this immunity, Congress does not have the power "to subject

nonconsenting States to private suits in their own courts[.]" Id. at 737, 119 S. Ct. at 2258, 144 L. Ed. 2d at 668.

New Jersey courts "have long recognized that an essential and fundamental aspect of sovereignty is freedom from suit by private citizens for money judgments absent the State's consent." Allen v. Fauver, 167 N.J. 69, 73-74 (2001). State sovereign immunity is a "right that goes to the essence of federalism: the right of a state not to be subjected to nonconsensual suit under" a federal statute in either federal or state courts. Id. at 77. Under New Jersey precedent, legislative consent to suit is "integral to [the] waiver of sovereign immunity." Id. at 74-75 (citing the Legislature's enactment of the Tort Claims Act ("TCA"), N.J.S.A. 59:1-1 to 12-3, and the Contractual Liability Act ("CLA"), N.J.S.A. 59:13-1 to -10, in response to the Court's decisions in P, T & L Constr. Co. v. Comm'r, Dep't of Transp., 55 N.J. 341, 343-46 (1970) and Willis v. Dep't of Conservation & Econ. Dev., 55 N.J. 534, 537-40 (1970), which expanded the State's liability in contract and tort). Unlike the State's sovereign immunity from suit in federal court, there is no New Jersey case law declaring that the State can waive its immunity from suit in state court through litigation conduct.

We review de novo an order disposing of a motion to dismiss for lack of subject matter jurisdiction based on contentions of state sovereign immunity. See Santiago v. N.Y. & N.J. Port Auth., 429 N.J. Super. 150, 156 (App. Div. 2012) (analyzing the Port Authority's claim of sovereign immunity under R. 4:6-2(a)), certif. denied, 214 N.J. 175 (2013). Subject matter jurisdiction can neither be conferred by agreement of the parties nor waived as a defense, and a court must dismiss the matter if it determines that it lacks subject matter jurisdiction. Macysyn v. Hensler, 329 N.J. Super. 476, 481 (App. Div. 2000) (indicating that such a motion can be made "at any time"); see also R. 4:6-7; Pressler & Verniero, Current N.J. Court Rules, comment 1 on R. 4:6-7 (2015).

## B.

It is against this legal framework that we consider whether state sovereign immunity precludes plaintiff's ADA claim and, if it does, whether that immunity extends to defendants as an arm of the State. We conclude that the State of New Jersey has immunity from suit under the ADA and that this immunity extends to defendants.

i.

The United States Supreme Court declared in <u>Board of Trustees of the University of Alabama v. Garrett</u>, 531 <u>U.S.</u> 356, 374, 121 <u>S. Ct.</u> 955, 967-68, 148 <u>L. Ed.</u> 2d 866, 883-84 (2001), that Congress does not have the constitutional authority to abrogate state sovereign immunity in federal court as to employment claims under the ADA. This is because "[s]tates are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions towards such individuals are rational." <u>Id.</u> at 367, 121 <u>S. Ct.</u> at 964, 148 <u>L. Ed.</u> 2d at 879. Thus, Congress cannot use its Fourteenth Amendment powers to compel states to be subject to lawsuits in federal court under the ADA.

Even though Congress cannot act, a state could voluntarily consent to be sued on an ADA claim in either state or federal court. <u>See</u> <u>Alden</u>, <u>supra</u>, 527 <u>U.S.</u> at 737, 119 <u>S. Ct.</u> at 2258, 144 <u>L. Ed.</u> 2d at 668 (noting a state can consent to "private suits in their own courts"). However, there are no "clear and unequivocal statements" of the New Jersey Legislature which have declared that the State has consented to be sued under the ADA. <u>Cf.</u> <u>Allen</u>, <u>supra</u>, 167 <u>N.J.</u> at 73-77 (holding that suits under the Fair Labor Standards Act (FLSA), 29 <u>U.S.C.A.</u> §§ 201 to 219, are precluded against the State because the Legislature has not

consented to be sued under the FLSA).  Thus, we must conclude that absent clear and unequivocal consent by the State Legislature, the State has retained its sovereign immunity against plaintiff's ADA claim.

ii.

We conclude that the State's sovereign immunity extends to defendants on plaintiff's ADA claim because defendants are considered an "arm of the State."  Alden, supra, 527 U.S. at 756-57, 119 S. Ct. at 2267-68, 144 L. Ed. 2d at 679-80 (noting that sovereign immunity "bars suits against States but not lesser entities" such as "a municipal corporation or other governmental entity which is not an arm of the State").  We reach this conclusion by applying a three-factor test enunciated by the United States Court of Appeals for the Third Circuit in Fitchik v. N.J. Transit Rail Ops., Inc., 873 F.2d 655, 659 (3d Cir.) (en banc), cert. denied, 493 U.S. 850, 110 S. Ct. 148, 107 L. Ed. 2d 107 (1989).[7]

The Third Circuit explained that, in determining whether immunity extends to a state entity, courts should consider: (1) whether the money that would pay any judgment against the

---

[7]  Although we are not bound by lower federal court decisions, we give such decisions due respect in an attempt to create "judicial comity" and to avoid forum shopping.  Deway v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 79-80 (1990).

15 A-3357-12T3

entity would come from the State; (2) the status of the entity under state law, including its treatment under the law and whether the entity is separately incorporated, whether the entity can sue or be sued in its own right, or is immune from state taxation; and (3) the entity's degree of autonomy from the State. Ibid. The "most important" of the factors is "whether the judgment would be paid by state funds." Id. at 664 (holding that the New Jersey Transit Corporation was not an arm of the State, in large part because it was not wholly funded by the State and it set aside funds to pay its own judgments).

Here, defendants are clearly an arm of the State under the Fitchik test. As to the first Fitchik factor, the NJSP is fully funded by the State and, as a result, the State would be obligated to satisfy any potential judgment against the NJSP from the State's treasury. See L. 2014, c. 14, § 66 (appropriating $228,414,000 from the Fiscal Year 2014-2015 budget to the NJSP).

As to the second Fitchik factor, the NJSP is not a separately incorporated entity. The NJSP is considered a "principal department" within the State's Department of Law and Public Safety. N.J.S.A. 52:17B-1. Our Constitution provides that "[e]ach principal department shall be under the supervision of the Governor . . . ." N.J. Const. art. V, § 4, ¶ 2.

As to the third <u>Fitchik</u> factor, the NJSP has little autonomy from the State. By statute, the Division of State Police is to be headed by a superintendent, appointed by the Governor with the advice and consent of the Senate, who "shall, with the approval of the [G]overnor, make all rules and regulations for the discipline and control of the state police." <u>N.J.S.A.</u> 52:17B-7; 53:1-2 and -10. Moreover, the "members of the State Police shall be subject to the call of the Governor" and "shall be peace officers of the State." <u>N.J.S.A.</u> 53:2-1.[8]

Finally, Fuentes is not distinguishable from the NJSP and is entitled to the same immunity. As our Supreme Court has recently noted, an official sued as an individual is personally liable for any judgment entered, but "[i]n contrast, an official-capacity suit 'is not a suit against the official [personally] but rather is a suit against the official's office.'" <u>Gormley v. Wood-El</u>, 218 <u>N.J.</u> 72, 85 n.3 (2014) (alteration in original) (quoting <u>Will v. Mich. Dep't of State Police</u>, 491 <u>U.S.</u> 58, 71, 109 <u>S. Ct.</u> 2304, 2312, 105 <u>L. Ed.</u> 2d 45, 58 (1989)). This is because damages awards against persons

---

[8] We note that the Federal District Court of New Jersey has consistently held that the NJSP is an "arm of the State." <u>See, e.g.</u>, <u>Simmerman v. Corino</u>, 804 <u>F. Supp.</u> 644, 650 (D.N.J. 1992), <u>aff'd</u>, 16 <u>F.</u>3d 405 (3d Cir. 1993) (holding that it was "beyond dispute" that the NJSP was an arm of the State).

acting in their official capacity can be executed against the State itself, which is the real party in interest. Ibid.; see also E. Orange v. Palmer, 47 N.J. 307, 327 (1966) (noting that, as to a sovereign immunity defense, the Court would "treat the question as if the suit directed against the two State officers were against the State itself").

### C.

We now turn to whether the trial court properly determined that defendants were estopped from raising the issue of state sovereign immunity as to the ADA claim. We conclude that state sovereign immunity cannot be waived by defendants and that defendants were not estopped from arguing that they were immunized as to plaintiff's ADA claim.

### i.

The United States Supreme Court has recognized a "clos[e] analogy" between state sovereign immunity at the state and federal levels. Sossamon v. Texas, ___ U.S. ___, ___ n.4, 131 S. Ct. 1651, 1658, 179 L. Ed. 2d 700, 709 (2011) (alteration in original) (citation and internal quotation marks omitted). Thus, because of this close correlation, and our own jurisprudence and court rules, we conclude that the issue of state sovereign immunity can be raised at any time during the

proceedings.[9]  See supra, Part II.A (noting that state sovereign immunity is treated as a subject matter jurisdiction claim which cannot be waived).

## ii.

We also reject the assertion that defendants essentially waived their state sovereign immunity through their litigation conduct by "waiting over [seven] years [and until the] completion of the trial."

As previously noted, a state can waive its immunity from suit in federal court through its litigation conduct by removing a case to federal court.  Lapides, supra, 535 U.S. at 624, 122 S. Ct. at 1646, 152 L. Ed. 2d at 816.  However, as the Court in Lapides recognized, the distinction as to whether a state waives its sovereign immunity through its litigation conduct lies in whether the state "voluntarily" or "involuntarily" invoked federal court jurisdiction.  Id. at 622, 122 S. Ct. at 1645, 152 L. Ed. 2d at 815.  Here, defendants did not seek a removal from state court to federal court, or do anything other than appear and defend against plaintiff's ADA claim.  See Biomedical Patent

_____

[9] Although not binding on us, we find persuasive support from the Supreme Court of Texas which explicitly recognizes that "the defense of sovereign immunity from suit sufficiently implicates subject matter jurisdiction" and thus the Texas Court concluded "that the defense may be raised for the first time on appeal." Manbeck v. Austin Indep. Sch. Dist., 381 S.W.3d 528, 530 (Tex. 2012).

Mgmt. Corp. v. Cal., 505 F.3d 1328, 1339 (Fed. Cir. 2007) (stating that a waiver by litigation conduct must be clear), cert. denied, 555 U.S. 1097, 129 S. Ct. 895, 173 L. Ed. 2d 106 (2009). We do not deem defendants' appearance in this action to be a clear voluntary invocation of the state court's general jurisdiction.[10]

Precluding plaintiff's ADA claim also does not prejudice plaintiff or give defendants a "litigation advantage." New Hampshire v. Ramsey, 366 F.3d 1, 16-17 (1st Cir. 2004). Plaintiff could have properly pursued a failure to accommodate claim under the NJLAD, which he initially did, but then dismissed this claim to pursue his CEPA claim. Precluding recovery on his ADA claim, which would have substantially used the same facts as his NJLAD claim, does not work unfair prejudice on plaintiff because dismissing the ADA claim places plaintiff in exactly the same position as a similarly-situated plaintiff facing a timely asserted sovereign immunity defense.

---

[10] Our Supreme Court's recent decisions have declined to endorse encroachment into the State's sovereign immunity without a clear indication of the Legislature's intent to consent to suit. See Allen, supra, 167 N.J. at 75 (noting that rules of "strict statutory construction" control regarding a statute that may "derogate[] sovereignty"); see also Henebema v. S. Jersey Transp. Auth., 219 N.J. 481, 490 (2014) (noting in the context of claims under the TCA that "[g]enerally, immunity prevails over liability to the extent that immunity has become the rule and liability is the exception").

In other words, he would have needed to establish his failure to accommodate claim under the NJLAD or not at all.[11] Here, because plaintiff waited until trial to dismiss his NJLAD claim, his proffer to the jury would have been substantially the same even if the ADA claim had been dismissed sooner.

Because we conclude that defendants are immune from liability from plaintiff's ADA claim, we need not reach defendants' contentions that the judge erred by usurping the jury and applying the wrong definition of "disabled" within the meaning of the ADA and that plaintiff's ADA claim is procedurally deficient because he failed to exhaust administrative remedies.

### III.

We reject defendants' arguments that plaintiff's job duties precluded him from bringing a CEPA claim, and that he otherwise failed to establish a prima facie CEPA violation.

### A.

After reviewing the trial record extensively, we conclude

---

[11] Plaintiff's request that we mold the ADA verdict into a NJLAD verdict, by reinstating the award of $500,000 in damages for emotional distress, is without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E). Plaintiff dismissed his NJLAD failure to accommodate claim (depriving him accessibility to a restroom), pursuant to the CEPA waiver clause, because he conceded that his assignment to car surveillance amounted to a claim of retaliation for whistleblowing under CEPA.

that defendants have overstated plaintiff's job responsibilities and understated the nature of plaintiff's whistleblowing. Plaintiff may properly pursue his CEPA claim because plaintiff's complained of conduct occurred both inside and outside his job description.  Cf. Massarano v. N.J. Transit, 400 N.J. Super. 474, 490-92 (App. Div. 2008) (finding that the plaintiff could not establish a CEPA claim because she was "merely doing her job"); but see Lippman v. Ethicon, Inc., 432 N.J. Super. 378, 380-82 (App. Div. 2013) (holding that "an employee's job title or employment responsibilities should [not] be considered outcome determinative in deciding whether the employee has presented a cognizable cause of action under CEPA"), certif. granted, 217 N.J. 292 (2014).

As the judge correctly found, plaintiff was not simply performing his job duties in making his repeated complaints. Plaintiff "blew the whistle" while working in the EEO/AA Unit, where his job duty at that time was to investigate the cases assigned to him as a staff investigator.  However, there is no credible evidence in the record to suggest that plaintiff had the responsibility to analyze the EEO/AA Unit as a whole or to evaluate its purported general shortcomings.

Moreover, plaintiff's whistleblowing activity included more than complaining about the alleged stalling of investigations in

the EEO/AA Unit. He complained to Fuentes that the Office of Professional Standards Unit, which was different from the EEO/AA Unit, engaged in discriminatory discipline by treating African American troopers more severely than white troopers for the same or similar offenses. Therefore, plaintiff was not simply investigating the cases assigned to him and reporting his findings, as he was tasked to do, but rather, his complaints went beyond his assigned cases and department.

### B.

We also conclude that plaintiff sufficiently established a prima facie case of a CEPA violation to reach the jury.

To state a prima facie case of retaliation under NJLAD or CEPA, a "plaintiff must show that 1) [he or] she was engaged in a protected activity known to defendant; 2) [he or] she was thereafter subjected to an adverse employment decision by the defendant; and 3) there was a causal link between the two." Woods-Pirozzi v. Nabisco Foods, 290 N.J. Super. 252, 274 (App. Div. 1996); see also Young v. Schering Corp., 275 N.J. Super. 221, 233 (App. Div. 1994), aff'd, 141 N.J. 16 (1995); Jamison v. Rockaway Twp. Bd. of Educ., 242 N.J. Super. 436, 445 (App. Div. 1990).

Failing to promote an employee can constitute an adverse employment action. Jamison, supra, 242 N.J. Super. at 447. If

the employee succeeds in establishing a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse action. Ibid. The plaintiff is then "afforded a fair opportunity" to show that the reason given "is a pretext for the retaliation or that a discriminatory reason more likely motivated the employer." Ibid. If plaintiff succeeds, a presumption of retaliatory intent is established. Id. at 445-46.

In a failure-to-promote context, the employer then "must prove by a preponderance of the evidence that the adverse action would have taken place regardless of the retaliatory motives of the employer." Id. at 447. "At that point, the employer's proofs must focus on the qualifications of the other candidates." Ibid. The Jamison court noted, "[b]y shifting the burden of proof, the responsibility is allocated to the party best able to marshal evidence and prove qualifications of other candidates." Ibid. This burden-shifting approach protects employees who engage in protected activities but does not place them in a better position than they would be otherwise. Ibid.

The parties here tried this case understanding that the statute of limitations period on plaintiff's CEPA claim began on September 1, 2004. To support plaintiff's retaliation claim based on a failure to promote, plaintiff was required to produce

evidence of a discrete retaliatory act occurring after September 1, 2004.[12] It is undisputed that plaintiff's whistleblowing activities, however, occurred prior to that date.

As our Supreme Court explained in Roa v. Roa, 200 N.J. 555, 561 (2008), "[a]lthough not actionable, evidence relating to barred claims may be admissible under N.J.R.E. 404(b) in the trial of the timely claim." Therefore, a plaintiff can use evidence of retaliatory actions connected to time-barred claims "'as background evidence in support of a timely claim.'" Id. at 567 (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S. Ct. 2061, 2072, 153 L. Ed. 2d 106, 122 (2002)).

Here, the jury properly considered the memo and other events prior to September 1, 2004, as background evidence for retaliation that occurred within the limitations period. The judge correctly instructed the jury that, in determining liability, it could only consider acts of retaliation occurring after September 1, 2004. The judge identified for the jury examples of retaliatory acts that generally occurred, at least in part, after September 1, 2004, such as plaintiff's assignment to car surveillance in 2006, and the October 2004 investigation

---

[12] At trial, the judge did not treat the CEPA claim as a continuing violation. Instead, the judge imposed a strict limitations period. Plaintiff's counsel did not object to the limitations period commencing on September 1, 2004, and he has not cross-appealed challenging it.

report resulting in mainly unsubstantiated allegations of wrongdoing.

There is evidence from which a jury could determine inferentially that plaintiff had been passed over for two discrete promotions while he served under a bureau chief (the "bureau chief") of the CTU, where plaintiff worked from May 2004 to September 2005. Plaintiff testified that he was doing well in the CTU and that he "had risen to the number one spot for a promotion" before the bureau chief arrived in late 2004. In February 2005, the NJSP passed over plaintiff by promoting another individual to acting sergeant first class. In June 2005, the bureau chief, who was a special advisor to Fuentes and was familiar with plaintiff's whistleblowing activity and "pending EEOA matter," ranked the members under his command and gave plaintiff a low ranking. As a result, plaintiff was not promoted to DSFC at that time. And, there was evidence from which the jury could have concluded that, had plaintiff been promoted in June 2005, he would have been promoted one more time before the end of his career.

IV.

Although plaintiff established a prima facie CEPA claim, the CEPA verdict is so fatally flawed that the judgment must be vacated and the matter remanded for a new trial on all issues

related to plaintiff's CEPA claim.

A.

First, we conclude that the judge erred by not giving a meaningful limiting instruction to the jury about how to use the evidence that plaintiff introduced of alleged racial discrimination. Plaintiff used this evidence to support his NJLAD claim. The omission of such an instruction had the clear capacity to lead to an unjust result.

During his case-in-chief, plaintiff introduced evidence of alleged racial discrimination unrelated to plaintiff's whistleblowing activities. In fact, the opening statements of both counsel stressed the existence of pervasive racial discrimination within the NJSP. There was also considerable testimony regarding defendants' alleged racial discrimination, which was admitted without objection because it was relevant to the NJLAD claim that remained viable until the close of plaintiff's case.

At the close of all the evidence, defendants' counsel asked whether the judge would instruct the jury that the race discrimination claim was no longer in the case. The judge declined to do so, but stated that defense counsel could inform the jury that "whatever you heard about discrimination is no longer a part of this case. . . ."

27

The judge partially instructed the jurors that "in addition, some causes of action are no longer a part of this case. And as a result of it, the document that was previously admitted into evidence, that was known as P-14,[13] is no longer evidence and may not be considered by you." The jury was not told by the judge which claims were dismissed by the end of the case, and it was not fully instructed on how to consider the complaint of disparate treatment for the CEPA claim.

Under these circumstances, the jury may well have thought that it was free to consider all of the testimony regarding racial discrimination in its deliberations for any purpose and that the only thing they had to disregard was P-14. See State v. Vallejo, 198 N.J. 122, 137 (2009) (finding that when the jury instruction was inadequate, an appellate court has "no alternative but to assume that the jurors took into account all of what transpired at trial"). Thus, the failure to give an adequate limiting instruction had the clear capacity to lead to an unjust result. Agha v. Feiner, 198 N.J. 50, 63 n.3 (2009); see also Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 501 (App. Div.) (vacating jury award and remanding for a new trial "because the jury instruction was erroneous and

---

[13] P-14 appears to be a redacted attorney-client memorandum.

inadequate"), certif. denied, 136 N.J. 298 (1994).[14]

B.

Second, we conclude that the judge failed to give an adequate jury instruction on the calculation of damages related to plaintiff's failure-to-promote allegations.

When reviewing a jury award, we are empowered to set aside the jury's verdict and grant a new trial when "it clearly and convincingly appears that a damages award is so excessive that it constitutes a miscarriage of justice." Johnson v. Scaccetti, 192 N.J. 256, 280 (2007) (citation and internal quotation marks omitted).

Here, plaintiff's CEPA economic-damages award was necessarily predicated on acts of retaliation that were time-barred. If the jury believed plaintiff's evidence and gave all possible inferences in plaintiff's favor, it could have concluded that he would have been promoted in June 2005 if he had not been the subject of retaliation. Plaintiff's counsel told the jury that plaintiff was "eligible for a promotion" in April 2004 and that, in calculating damages, they should determine that his salary would have increased on October 1, 2004. Although the judge told the jury that it could not rely

---

[14] Therefore, we need not reach defendants' remaining arguments pertaining to other purported trial errors.

A-3357-12T3

on retaliation occurring prior to September 1, 2004, the jury was not informed that it needed to find a specific failure to promote within the limitations period and to base any damages calculation from the date plaintiff would have started that new position.

The jury plainly calculated damages for failure to promote for the entire period sought by plaintiff, as it awarded more money in each category of economic damages than plaintiff requested. Plaintiff's counsel argued that plaintiff's damages, calculated from October 2, 2004, forward, consisted of $51,208 in lost wages and $263,200 in lost pension benefits. The jury actually awarded damages of $55,000 in lost wages and $305,000 in lost pension benefits. The jury could not have reached these numbers based on the promotions that were arguably supported by the evidence, namely to DSFC in June 2005, and to lieutenant two to three years after that.

C.

Finally, the award of emotional-distress damages on plaintiff's CEPA claim was also compromised by the jury charge and plaintiff's counsel's comments in summation.

Plaintiff's counsel told the jury during closing argument that, in addition to economic damages, plaintiff was seeking "[d]amages for emotional distress accompanied by the stress that

affected his ulcerative colitis." Plaintiff had testified that stress exacerbated his condition and that stress from the bureau chief's actions resulted in hospitalization. The parties agreed, however, that there was no claim that defendants caused plaintiff's ulcerative colitis. As a result, the jury may have included, as part of its emotional distress calculation, damages for pain and suffering associated with plaintiff's underlying medical condition.

The comments by plaintiff's counsel in summation were further complicated by the jury charge. The judge's charge on non-economic damages essentially tracked the model jury charge. See Model Jury Charge (Civil), 8.11E "Disability, Impairment and Loss of the Enjoyment of Life, Pain and Suffering" (2009). Because that charge encompasses physical limitations and physical pain and suffering as well as emotional distress, the judge instructed the jury that plaintiff would be entitled to recover "for any injury resulting in . . . an impairment of his . . . health, or ability to participate in activities," and that "proper items for recover[y]" include "any pain, physical or mental suffering, discomfort, and distress that the plaintiff may have endured as a natural consequence of the violations of CEPA." This contradicts the stipulation that there was no claim that defendants caused plaintiff's ulcerative colitis.

We vacate the ADA award, dismiss plaintiff's ADA claim with prejudice, and remand for further proceedings on plaintiff's CEPA claim consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3357-12T3