766 A.2d 820 (2001)
337 N.J. Super. 181
STATE of New Jersey, Plaintiff-Respondent,
v.
Nelson DE LA PAZ, Jr., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted December 13, 2000.
Decided February 16, 2001.
*822 Joel M. Harris, First Assistant Public Defender, for appellant (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the brief).
Ronald S. Fava, Passaic County Prosecutor, for respondent (Marc A. Festa, Assistant Prosecutor, of counsel and on the brief).
Before Judges BAIME, WALLACE, and CARCHMAN.
*821 The opinion of the Court was delivered by CARCHMAN, J.A.D.
Following denial of his motion to suppress evidence seized in the warrantless search of another's home, defendant Nelson De La Paz, Jr. was tried by a jury and convicted of possession of more than 50 grams of marijuana, N.J.S.A. 2C:35-10a(3), possession of marijuana with intent to distribute, N.J.S.A. 2C:35-5a(1), b(11), possession of marijuana with intent to distribute in a school zone, N.J.S.A. 2C:35-7, and possession of paraphernalia with intent to distribute, N.J.S.A. 2C:36-3. After appropriate mergers, defendant was sentenced to a three-year aggregate term with a three-year period of parole ineligibility. Defendant appeals the denial of his suppression motion on both state and federal constitutional grounds. We reverse, and conclude that defendant's motion should have been granted, as defendant had standing to challenge the officers' actions under Article I, Paragraph 7 of the New Jersey Constitution, and no exigent circumstances existed to justify the warrantless entry.

I.
During the early morning hours of May 5, 1998, Paterson Police Sergeant William D. Mott, the State's sole witness at the hearing, was summoned by Lieutenant Sammy Torres to a diner. There, Lieutenant Torres instructed Mott to follow him to a location where, according to an unidentified informant of unknown reliability, drugs were being packaged and distributed. Mott and fellow patrol Officers DeLucca and DeLorenzo followed Torres and the informant to 335 Getty Avenue, arriving at approximately 2:41 a.m. The four uniformed officers double-parked their four squad cars on the wrong side of Getty Avenue "[d]own a couple of houses" from the target address. The informant then pointed from the public sidewalk to a lighted window approximately twenty-five feet down the right-hand side of a shared "double-wide" concrete alleyway between two two-family homes, and indicated that drugs were being packaged there. The informant was instructed to stay with his vehicle while the officers entered the alley to investigate.
*823 The alley was dark, but immediately accessible from the public sidewalk. It was approximately ten feet wide, twenty-five feet long, and blocked-off at the far end by a fence with two separate "doors" leading to the properties' respective back yards. Each house facade on the alley contained windows, but no doors, and at least one utility meter was located on the side of the target house near the head of the alley. Although the lighted window's interior was covered by horizontal blinds and a translucent sheet, the blinds were open, the fabric failed to cover several inches of the lower portion of the window, and the window itself was slightly ajar. From a distance of approximately twelve to eighteen inches, the officers peered through the window's lower glass pane, which was approximately six feet above the ground, directly into the dwelling. There, the officers observed a resident, Shawn Dax Ackerson (Ackerson), and his guest, defendant (the "suspects"),[1] repackaging suspected marijuana from a large plastic bag into small plastic bags while seated at a table in the center of the room. Officer DeLorenzo remained at the back of the alley while the other three officers returned to the public sidewalk to radio the department's narcotics division for an "assess[ment of] the situation, and [to] have them contact the judge and do a warrant." Contrary to Lieutenant Torres' instructions, the informant had already departed.
After ten to fifteen minutes of failed attempts to obtain assistance from a narcotics detective, Lieutenant Torres decided to "do the window," as the officers had already ascertained that several deadbolts on the front door of the home precluded easy access by that route. The officers re-entered the alleyway, retrieved a chair located next to the fence, and planned to enter the lighted room where the suspects were seated by opening the window and shoving Lieutenant Torres through it. Lieutenant Torres' unsuccessful efforts to raise the window while standing on the chair alerted the suspects, who remarked, "did you hear that?" and shut off the light. The officers crouched down, and approximately one to two minutes later, the suspects turned on the light and resumed their positions and packaging activities. The officers continued their surveillance through the window.
Having failed to "do the window," Torres then instructed Mott to "try the front door" while Torres covered the window and DeLorenzo covered the rear of the house. Officer DeLucca accompanied Mott to the front door, which Mott kicked-in with "two or three shots." DeLucca and Mott then ran through the house, arrested the suspects, and seized the evidence. Approximately twenty minutes had elapsed between the time the four officers first arrived on the scene and their warrantless entry through the front door.
Sergeant Mott stated that although none of the officers had ever been assigned to the narcotics division, he had made "several hundred[ ]" narcotics arrests and had participated in "dozens" of surveillance operations. He explained that no further efforts were made to obtain a search warrant after the failed attempt to contact the narcotics division because, while he had been trained at the police academy concerning the circumstances under which search warrants are required, he had "no idea" how long it might take to obtain a warrant or "how to go about it," as he had never had occasion to do so in his twenty years on the Paterson Police patrol. Mott further explained that he believed time was of the essence because "officers always feel in danger while [they're] working," and he was concerned by the informant's departure and whether the "maybe two" pedestrians in the area might have seen the officers. However, Mott also acknowledged *824 that the officers never drew their weapons, that he did not, in fact, feel he was in any danger, and that there was no indication the suspects were about to depart. Ultimately, Sergeant Mott justified the warrantless entry as follows:
A.There was a culmination of things. We couldn't contact narcotics, couldn't get them to respond. The noise that we made initially we felt they were becoming suspicious. They had looked outas I said earlier they actually looked at me a couple of times. I didn't know how they didn't see me. We felt we had to act now before anything happened to the narcotics.
Q. You say before anything happened to the narcotics, what do you mean?
A. Well, it could be stored somewhere else in the home where I may not find it. It could be disposed of or it could be sold.
Q. Now did you have any concern with respect to the people that you saw walk by?
A. Well, I had said that earlier. We were in plain view from the sidewalk. Anybody walking byand that is a neighborhood where there is a lot of narcotic traffic. If somebody walks by that knows the individuals in the house, they could alert them also.
....
Q. Now did you consider at the time that you were in the alleyway, did you consider trying to get a warrant on your own if you weren't able to reach the narcotics bureau?
A. I had talked it over with Lieutenant Torres about trying to possibly call the judge on our own. But I have never done one before and I didn't know how long it would take to get in contact with the judge or how to go about it.
Q. So did you feel that time was a factor?
A. Yes, I did.
Q. If you were to try to go that route what steps would you have taken to try to do that?
A. Like I said, I've never done it before. Based upon what I think I would have had to do, I would have to contact the judge, do an affidavit. Swear to everything in it was true, have him swear me in, whether it be on the phone or in person, and then complete the warrant if he okays it.
Q. Now on that night did you feel that would have been practical given the situation that you were in and the time of night?
A. I didn't think so because of the people who could observe us. The person-when the informant left it sort of got me a little suspicious. I didn't know if he had other motives for this and like I said I've never seen him again since then.
He left that night. I believe Lieutenant Torres told him to stay in his car and he left. So there was a lot of things that get your head thinking when you're in that situation.
Defendant presented no evidence on the motion.
The judge denied defendant's suppression motion on both state and federal constitutional grounds. He determined that although the unidentified informant's tip did not provide probable cause for a search, none was required because ground-floor occupants of the home could have no reasonable expectation of privacy given the height of the window, the common ingress and egress the alleyway provided for the two-family homes on either side, and the presence of utility meters in the alley. The judge concluded that the officers' observations through the window did provide probable cause, and that the warrantless entry, search, and seizure were justified under the exigent circumstances and plain-view exceptions to the warrant requirement:
Now, what was in view of the officers was marijuana, apparently. It is a matter *825 of common knowledge and I certainly can take notice of the fact that a suspect could easily dispose of a substantial quantity of marijuana merely by going into the bathroom and flushing it down the toilet and that would not take very long to do. So, there was a certain degree of exigency that is created by the fact that the marijuana, this illegal substance, was readily disposable. The question is under the circumstances was it reasonable for the officer to believe that that could happen.
Now, I'm persuaded that under these circumstances that it was reasonable for them to believe that it might happen for the following reasons.
First of all, the officers had been there for a period of time and apparently had alerted the defendants to the fact that someone may have been at the window when they tried to open it. Now, that alone, quite frankly, wouldn't justify the entry into the apartment because that would mean all the officers have to do is act foolishly and carelessly to create the exigent circumstances and then that would justify a warrantless entry, but it is a factor that I will consider.
The other facts are that these were not undercover officers but they were uniformed officers. There are four of them and here they are at 2:30, three o'clock in the morning lurking about this house. Certainly the testimony, the uncontradicted testimony is that there were other people in and about the street. Their presence may be known and readily observable. They certainly didn't blend into the neighborhood as perhaps undercover officers might have.
Thirdly, the confidential informant had mysteriously disappeared. There was no explanation as to why he had left before the officers had completed their assignment and the officers expressed a real concern that he may have decided to alert the individuals to the presence of the police.
Faced with that and faced with the fact that they were not able to obtain further information from the narcotics unit or any information from the narcotics unit about getting a warrant, they couldn't raise anybody at the location of the police headquarters. The police were faced with a dilemma. Do they continue to wait to try and raise somebody at narcotics? Do they send somebody back to try and get a warrant? With the passage of time, the longer they wait, the more likelihood is that their presence is going to be discovered and they may have had to make a decision and the decision was to go into the building and conduct an entry, which they did through the front door.
Now, they entered the building, secured the occupants and went to the rear room where activities were being conducted and the materials that were seized were all clearly in plain view on the table.
I questioned whether the police having entered the building should have at least at that point stopped, secured the occupants and then called for a warrant.... But under these circumstances where they indicated that at least one of the individuals was apprehended in the back room, a certain amount of practicality has to be present here.
Is it really necessary if the entry into the building was justified by exigent circumstances and the securing of the individuals required the police to go the room where the individuals were conducting their nefarious activities and if on the table there is the drugs that are the object of this operation, do the police have to stop, say no, we're not going to touch the drugs, we're just going to secure the people and call for a warrant? I don't think they have to do that. Had they conducted a more thorough search of the building, had, for example they decided they were going to search every room of the first floor flat and had they uncovered other illegal items or controlled *826 substances, perhaps those substancesthose proceeds and those objects could have been suppressed. But under the circumstances what they seized was what they saw and what they saw was in plain view.

II.
Appellate courts owe no special deference to a trial judge's interpretation of the law or legal consequences flowing from established facts; however, our scope of review of a judge's fact-finding is extremely narrow. In re Return of Weapons to J.W.D., 149 N.J. 108, 116-17, 693 A.2d 92 (1997); State ex rel. S.B., 333 N.J.Super. 236, 241, 755 A.2d 596 (App.Div.2000). We will not disturb a finding which "`could reasonably have been reached on sufficient credible evidence present in the record'" considering the proofs as a whole. State v. Locurto, 157 N.J. 463, 471, 724 A.2d 234 (1999) (quoting State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964)); State ex rel. S.B., supra, 333 N.J.Super. at 241, 755 A.2d 596. Only where we are "`thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction,'" may we appraise the record as if deciding the matter at inception, and make our own findings and conclusions. Ibid.
While we acknowledge the trial judge's extensive findings, we disagree with his conclusion that exigent circumstances justified the officers' warrantless entry. We therefore need not decide whether the suspects, and defendant as a "guest" in Ackerson's home, had any reasonable expectation of privacy from the view of passers-by through the partially uncovered, eye-level window on this quasi-public alleyway.[2] We also conclude that under these circumstances, the judge's "plain-view" and Fourth Amendment analyses are inapposite.

III.
As a preliminary matter, we note that the motion judge and the parties mistakenly assumed defendant's coextensive "standing" to challenge the officers' actions on both state and federal constitutional grounds. Our courts have long recognized that "standing" under the Fourth Amendment and Article I, Paragraph 7 of the New Jersey Constitution is a substantive, rather than procedural issue, and that the critical inquiry, by any name, is "whether the defendant moving to suppress evidence obtained and sought to be used against him has ... interests sufficient to qualify him as a person aggrieved by an unlawful search and seizure." State v. Alston, 88 N.J. 211, 218-19 & n. 2, 440 A.2d 1311 (1981) (citing R. 3:5-7(a) and quoting Rakas v. Illinois, 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387, 399 (1978)). While only alluded to at the hearing, the issue of defendant's standing under state and federal constitutional principles requires further discussion. Alston, supra, 88 N.J. at 229 & n. 12, 440 A.2d 1311. ("[W]hen ruling on suppression motions in which standing may be in issue under federal and state claims, the court should make explicit findings and legal conclusions as to standing under both the Federal and State Constitutions."). However, as no evidence was adduced concerning the nature of defendant's "guest" status and concomitant expectation of privacy in the premises, we cannot determine on this record whether defendant's Fourth Amendment *827 rights were implicated. Compare, e.g., Minnesota v. Carter, 525 U.S. 83, 85-91, 119 S.Ct. 469, 471-74, 142 L.Ed.2d 373, 377-81 (1998) (holding that transient guests present for the sole purpose of repackaging cocaine had no legitimate expectation of privacy in host's apartment, and thus no Fourth Amendment "standing" to challenge officer's observation through gap in closed blinds of ground-floor window, regardless of whether it constituted a "search"), with Minnesota v. Olson, 495 U.S. 91, 98-100, 110 S.Ct. 1684, 1688-90, 109 L.Ed.2d 85, 94-96 (1990) (holding that overnight guest suspected as robbery/murder accomplice had legitimate expectation of privacy in host's duplex, and thus "standing" to challenge warrantless entry), and United States v. Fields, 113 F.3d 313, 320-21 (2d Cir.), cert. denied, 522 U.S. 976, 118 S.Ct. 434, 139 L.Ed.2d 334 (1997) (holding that defendant who regularly "cook[ed] and cut" crack cocaine in host's apartment, as well as his guest, both had legitimate expectations of privacy in apartment regardless of their lack of overnight-guest status and the commercial nature of their visit, and thus "standing" to challenge window "search" through gap beneath closed blinds of ground-floor window and subsequent warrantless entry). Nevertheless, we must consider whether State constitutional principles provide a basis for standing.
We observe that our courts "part[ed] company with the [United States] Supreme Court's view of standing" nearly two decades ago precisely because "[a]dherence to the vague `legitimate expectation of privacy' standard, subject as it is to the potential for inconsistent and capricious application, will in many instances produce results contrary to commonly held and accepted expectations of privacy" and the fundamental principle rooted in article I, paragraph 7 that people's "effects," as well as their "persons" and "houses," are constitutionally protected against unreasonable searches and seizures. Alston, supra, 88 N.J. at 226-27, 440 A.2d 1311. We decline to address defendant's federal claim under the Fourth Amendment, which must be predicated solely upon defendant's reasonable privacy expectation in the premises, regardless of his alleged possessory interest in the items seized. See Alston, supra, 88 N.J. at 218-24, 440 A.2d 1311 (citing Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); United States v. Salvucci, 448 U.S. 83, 86-90, 100 S.Ct. 2547, 2550-52, 65 L.Ed.2d 619, 624-27 (1980); Rakas v. Illinois, supra, 439 U.S. at 142-49, 99 S.Ct. at 429-33, 58 L.Ed.2d at 400-04). We resolve this case exclusively upon state grounds, under the more expansive "standing" afforded by Article I, Paragraph 7 of the New Jersey Constitution.
In State v. Alston, supra, the New Jersey Supreme Court construed article I, paragraph 7 to extend protection against unreasonable searches and seizures beyond the Fourth Amendment's "legitimate expectation of privacy" limits, thus conferring "standing" (that is, a substantive privacy right) to defendants with proprietary, possessory, or participatory interests in the place searched or the item seized, as well as "automatic standing" to those charged with offenses in which possession of the evidence seized is an essential element of guilt. 88 N.J. at 225-30, 440 A.2d 1311. See also State v. Mollica, 114 N.J. 329, 339, 554 A.2d 1315 (1989); State v. Curry, 109 N.J. 1, 7-8, 532 A.2d 721 (1987). In retaining the automatic standing rule of Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), which the United States Supreme Court rejected in Salvucci and Rawlings, supra, the Alston Court observed that a defendant asserting that right based upon a possession charge "need not make `a preliminary showing of an interest in the premises searched or the property seized,'" and that the motion judge must proceed "directly to a consideration of the merits of the suppression motion and determine the legality vel non of the challenged search." 88 N.J. at 222 n. 6, 228, 440 A.2d 1311 (quoting Jones, supra, 362 *828 U.S. 257, 263, 80 S.Ct. 725, 732, 4 L. Ed.2d 697, 702 (1960), overruled by Salvucci, supra, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619).
Although we recognize that under extreme circumstances, defendant's objectively reasonable expectations of privacy in Ackerman's dwelling under "`general social norms'" might still be relevant in determining his substantive privacy rights under article I, paragraph 7 were there evidence that defendant was present without Ackerman's consent, there is absolutely no indication in the record that defendant was anything other than Ackerman's invited guest. See e.g., State v. Harris, 298 N.J.Super. 478, 483-85, 689 A.2d 846 (App.Div.), certif. denied, 151 N.J. 74, 697 A.2d 546 (1997) (finding murder defendant with participatory interest in seized telephone answering machine tape lacked constitutionally protected privacy interest in co-conspirator's apartment to which he unlawfully gained entry); State v. Smith, 291 N.J.Super. 245, 261-62, 677 A.2d 250 (App.Div.1996) (finding drug possession defendant with automatic standing lacked constitutionally protected privacy interest in apartment to which he unlawfully and forcibly gained entry), rev'd, 155 N.J. 83, 101-02, 713 A.2d 1033 (1998) (finding circumstances of case did not require consideration of defendant's privacy interest in apartment as evidence would be suppressed as fruit of the poisonous tree due to initial illegality of officer seizing apartment keys from defendant's person), cert. denied, 525 U.S. 1033, 119 S.Ct. 576, 142 L.Ed.2d 480 (1998). See also State v. Lugo, 249 N.J.Super. 565, 568, 592 A.2d 1234 (App.Div.1991) (finding defendant operating stolen vehicle had no reasonable expectation of privacy respecting contraband hidden therein); State v. Arias, 283 N.J.Super. 269, 277-81, 661 A.2d 850 (Law Div.1992) (finding murder defendant, the "ultimate uninvited guest," had no reasonable expectation of privacy in live and discharged ammunition left in home he commandeered at gunpoint). Pursuant to Alston and its progeny, and contrary to contemporary federal jurisprudence under the Fourth Amendment, defendant's charged possession offenses, as well as his participatory interest in the evidence seized, unquestionably confer both standing to challenge the officers' actions and substantive privacy rights under article I, paragraph 7, regardless of the precise nature of defendant's guest status or privacy interest in the dwelling. See, e.g., Mollica, supra, 114 N.J. at 339-40, 357, 554 A.2d 1315 (finding defendant charged with gambling offenses had standing via participatory interest in co-defendant's hotel room telephone and toll records despite lack of possessory or proprietary interest in use of the telephone); Alston, supra, 88 N.J. at 218-19, 228-30, 440 A.2d 1311 (finding automobile guest passengers charged with unlawful weapons possession had automatic standing regardless of any reasonable expectation of privacy in the vehicle searched).

IV.

A.
Article I, Paragraph 7 of the New Jersey Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." N.J. Const. art. I, ¶ 7. Warrantless searches and arrests in the home are the chief evil against the warrant requirement is directed, and are presumptively unreasonable absent both probable cause and exigent circumstances. State v. Hutchins, 116 N.J. 457, 462-63, 561 A.2d 1142 (1989); State v. Lewis, 116 N.J. 477, 483, 561 A.2d 1153 (1989); State v. Holland, 328 N.J.Super. 1, 744 A.2d 656, (App. Div.), certif. denied, 164 N.J. 560, 753 A.2d 1153 (2000); State v. Alvarez, 238 N.J.Super. 560, 567, 570 A.2d 459 (App.Div.1990).
Whether exigent circumstances exist to justify a warrantless home search or seizure is highly fact-dependant. Lewis, supra, 116 N.J. at 487, 561 A.2d 1153; *829 Alvarez, supra, 238 N.J.Super. at 568, 570 A.2d 459. Factors to be considered include:
"(1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) reasonable belief that the contraband is about to be removed; (3) the possibility of danger to police officers guarding the site of contraband while a search warrant is sought; (4) information indicating the possessors of the contraband are aware that the police are on their trail; (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in narcotics traffic; (6) the gravity of the offense involved; (7) the possibility that the suspect is armed; (8) the strength or weakness of the facts establishing probable cause[;] and (9) the time of the entry."
[State v. Deluca, 325 N.J.Super. 376, 391, 739 A.2d 455 (App.Div.1999), certif. granted, 163 N.J. 79, 747 A.2d 287 (2000) (quoting Alvarez, supra, 238 N.J.Super. at 568, 570 A.2d 459).]
Where the threatened removal of drugs from a residence is offered as an exigent circumstance, "`whether the physical character of the premises is conducive to effective surveillance, as an alternative to a warrantless entry, while a warrant is procured' " must be considered. Alvarez, supra, 238 N.J.Super. at 568, 570 A.2d 459 (quoting Lewis, supra, 116 N.J. at 485, 561 A.2d 1153). Finally, "whether the exigent circumstance can properly be characterized as `police-created,' and, if so, whether it arose `as a result of reasonable police investigative conduct intended to generate evidence of criminal activity'" must also be taken into account. Ibid. (quoting Hutchins, supra, 116 N.J. at 460, 561 A.2d 1142). Police-created exigent circumstances which arise from unreasonable investigative conduct cannot justify warrantless home entries. See Hutchins, supra, 116 N.J. at 460, 474-76, 561 A.2d 1142; State v. Josey, 290 N.J.Super. 17, 24-31, 674 A.2d 996 (App.Div.), certif. denied, 146 N.J. 497, 683 A.2d 200 (1996); State v. Stanton, 265 N.J.Super. 383, 386, 627 A.2d 674 (App.Div.1993).

B.
Based upon our review of the record, we are convinced that although the officers' observations from the alley unquestionably gave them probable cause to believe that a crime was occurring, the "exigent circumstances" alleged as justification for their warrantless entry were impermissibly self-created. We fully appreciate the time of the entry, and we are cognizant of the officers' apparent inability to secure a warrant. However, we also note that Sergeant Mott demonstrated his knowledge that telephonic warrants are available, and that the required procedure for obtaining a warrant, whether in person or via a telephonic or radio application under "exceptional circumstances," is relatively straightforward. See R. 3:5-3. See also Pressler, Current N.J. Court Rules, comment 3 on R. 3:5-3 (2001); 32 New Jersey Practice, Criminal Practice and Procedure §§ 3.1-3.8, at 111-16, § 16.164, at 161-64 (Leonard N. Arnold) (3d ed.2000-2001).
We conclude that both the time of entry and the absence of a warrant were of the officers' own making, as there was no obvious urgency requiring their immediate response at the scene, and their lack of knowledge concerning the warrant application process was apparently the status quo, rather than a function of true inexperience, the hour, or any unfolding event. Compare Alvarez, supra, 238 N.J.Super. at 563, 566, 571, 570 A.2d 459 (noting that compelling degree of urgency merited four uniformed officers' immediate response to trustworthy tip about disturbance involving drugs in hotel room registered to known drug suspect where there had been "a great volume of `foot traffic' to and from the room"). Finding the circumstances in this case sufficient to justify a warrantless entry would reduce the warrant requirement *830 to a nullity. Moreover, we note that the amount of time necessary to obtain a warrant does not appear to have been a real factor in the officers' decision to bypass the warrant requirement, as Sergeant Mott testified that he had "no idea" how long it would take.
Unlike the motion judge, we do not consider the possibility that the suspects may have been alerted to the officers' presence by their "foolish[ ] and careless[ ]" acts in attempting to enter the window a factor which would mitigate in favor of finding any true exigency. Aside from the obvious logical inconsistency that an attempted warrantless entry could legitimately give rise to exigent circumstances justifying a warrantless entry, the record demonstrates that the suspects were unaware of the officers' surveillance, and that they gave no indication they were about to hide, remove, or destroy the contraband, or depart from the premises even after the officers' commotion at the window. While indications that drug evidence may be lost absent immediate police action are highly relevant in determining whether exigent circumstances exist to justify a warrantless entry, see Hutchins, supra, 116 N.J. at 465-69, 561 A.2d 1142; Josey, supra, 290 N.J.Super. at 28-30, 674 A.2d 996, the destructible nature of drug evidence, in and of itself, does not constitute an exigency sufficient to avoid the warrant requirement, see State v. Speid, 255 N.J.Super. 398, 402-03, 605 A.2d 297 (Law Div.1992).
As to danger posed by the suspects, although no evidence was adduced concerning the gravity of the offense as perceived by the officers on the scene, we note the absence of any indication that the suspects were previously known to the officers, armed, or otherwise dangerous. We also note that despite his global statement that "officers always feel in danger," Sergeant Mott testified that the officers never drew their weapons, and that he did not, in fact, feel he was in danger. We further question the assertion of potential danger posed by the informant and passers-by under these circumstances. The fact that the four uniformed officers double-parked their patrol cars on the wrong side of the street, stood on a public sidewalk with the informant as he pointed down the alleyway, and walked up and down the alleyway and onto the front porch of the residence to observe the locks on the door, belies Sergeant Mott's expressed concern that the officers would be detected by the "maybe two" pedestrians observed over the course of twenty minutes. And while we appreciate that the unknown informant's departure contrary to Lieutenant Torres' instructions made Sergeant Mott "a little suspicious," that unsurprising circumstance did not create the magnitude of exigency required to circumvent constitutional proscriptions.
Finally, considering the collateral issue of whether the premises were conducive to effective surveillance while a warrant was obtained as an alternative to the warrantless search and seizure, we note that the officers were effectively dispersed at the front, rear, and side of the dwelling just prior to Sergeant Mott's forced entry, and that the Sergeant stated the officers would have stopped the suspects "[i]f they had came [sic] out of that first floor." In sum, we conclude there were no exigent circumstances justifying the officers' warrantless entry, and that defendant's motion to suppress the evidence should therefore have been granted.
Reversed.
NOTES
[1] Defendant's and Ackerson's motions to suppress were consolidated for the hearing pursuant to R. 3:5-7(c).
[2] We assume, for the sake of argument, that the officers' window surveillance from a common alleyway based upon the unverified tip of an unknown informant was not constitutionally offensive. See, e.g., State v. Smith, 37 N.J. 481, 490, 495-97, 181 A.2d 761 (1962), cert. denied, 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055 (1963) (peering from common hallway in three-flat apartment building through crack or keyhole of defendant's door not a search); State v. Gibson, 318 N.J.Super. 1, 9-10, 722 A.2d 960 (App.Div.1999) (peering from common thoroughfare into residential driveway not a search); State v. Stanton, 265 N.J.Super. 383, 384-87, 627 A.2d 674 (App. Div.1993) (peering from common hallway into motel room window when occupant pulled back drapes not a search).