NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4796-12T3

DENISE BROWN,

     Plaintiff-Appellant,

v.

STATE OF NEW JERSEY and
JOHN STEET, DETECTIVE (NJSP),
both in his individual and
official capacity as New Jersey
State Police Detective,

     Defendants-Respondents,

and

RICK FUENTES COLONEL, both in his
individual capacity and official
capacity as Superintendent of New
Jersey State Police, CHRISTIAN
ESKRIDGE TROOPER (NJSP), both in his
individual capacity and official
capacity as Superintendent of New
Jersey State Police, CITY OF VINELAND,
TIMOTHY CODISPOTI, both in his
individual and official capacity
as Vineland Chief of Police,
JOSEPH VALENTINE, both in his
individual and official capacity
as Vineland Police Sergeant, DAVID
HENDERSCOTT OFFICER, both in his
individual and official capacity
as Vineland Police Officer, OFFICER
SMITH, both in his individual and
official capacity as Vineland Police
Officer, and OFFICER SOTO, both in her

| APPROVED FOR PUBLICATION |
| :---: |
| September 11, 2015 |
| APPELLATE DIVISION |

individual and official capacity as
Vineland Police Officer,

     Defendants.

_____

Submitted December 16, 2014 - Decided September 11, 2015

Before Judges Nugent, Accurso and Manahan.

On appeal from Superior Court of New Jersey,
Law Division, Cumberland County, Docket
No. L-674-09.

William A. Riback, attorney for appellant.

William P. Flahive, attorney for
respondents.

The opinion of the court was delivered by

ACCURSO, J.A.D.

Two members of the New Jersey State Police entered plaintiff Denise Brown's home without a warrant and without consent in order to "secure the apartment" while they sought a search warrant for the premises. They were looking for evidence of a home invasion they believed had been committed by her boyfriend, and, specifically, for a stolen piece of jewelry they had reason to suspect he had given her.

The officers were able to secure a warrant several hours after entering Brown's apartment. A search, however, did not uncover the jewelry or any useful evidence. Brown was not a suspect in the investigation and was never arrested or charged

with any crime.  The charges against Brown's boyfriend were dismissed before trial.

Brown sued the State and New Jersey State Police detective John Steet[1] for violating her state constitutional rights under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2c.  A jury returned a verdict for defendants and the judge denied Brown's motion for judgment notwithstanding the verdict (JNOV) and for an injunction requiring the State Police to take all steps necessary to come into compliance with the warrant requirement.

Brown appeals from the denial of her JNOV motion contending that she is entitled to judgment and an injunction "because it is indisputable the [State Police] seized and entered her residence absent a warrant, consent, or exigent circumstances according to policy and training."  We affirm the denial of the motion as to the State, as well as the denial of an injunction because the State is immune from suit under the Civil Rights Act.  We reverse the denial of the motion as to Steet and remand for a trial on damages because the troopers' testimony establishes, indisputably, that their entry into Brown's

---

[1]    Brown sued several others as well.  The claims against all of the other defendants were dismissed on motion either before or after trial.  Brown has not appealed from any of those orders.

residence before securing the warrant was unlawful as a matter of law.

We review the denial of a JNOV motion using the same standard as the trial court and thus consider "'whether the evidence, together with the legitimate inferences therefrom, could sustain a judgment in . . . favor of the party opposing the motion.'" Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 415 (1997) (quoting Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969)). To the extent the trial court's denial of Brown's motion was premised upon an interpretation of the law relating to warrantless searches, our review is de novo. See Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014).

We take the facts from the trial testimony of the State Police detectives. The detectives were investigating a home invasion that had happened about three weeks before the events at Brown's home. Two men wielding revolvers had forced their way into a home in Dennis Township in Cape May County and made off with some jewelry.[2] Witnesses saw two men, one carrying a

---

[2] The home invasion was apparently a case of drug dealers stealing from drug dealers. The victim told police that the robbers had attempted to force her to open a safe in the basement belonging to her boyfriend, the target of a narcotics investigation by the Cumberland County Prosecutor's Office, who also resided in the home. When she was unable to open the safe, the robbers fled. The victim gave the officers consent to search her home. They recovered $20,000 cash in the safe, and

(continued)

black drawstring, backpack-type bag, get into a blue BMW and drive away. The detectives identified Brown's boyfriend as a suspect. They also acquired information from two different but related sources that he had given Brown a locket stolen in the robbery.[3]

Over a week later, Vineland police stopped a blue BMW matching the one witnesses saw in Dennis and arrested the three occupants. The BMW belonged to Brown and was being driven by her boyfriend. State Police impounded the car intending to get a search warrant for its contents. The detectives waited over a week to apply for a warrant to search the car. In the interim, one of the detectives, the lead investigator, spoke several times to Brown, who was anxious to recover her car. Upon obtaining the warrant, the lead investigator called Brown to

(continued)
$1000 in the pocket of a jacket in the master bedroom as well as a quantity of marijuana.

The victim's mother reported that her ex-boyfriend spoke frequently about robbing her daughter's boyfriend, and that she told him if he was going to do it, he should do it when her grandchildren were not home. She also told police that Brown's boyfriend committed the robbery for her ex-boyfriend.

[3]    The mother's ex-boyfriend was the source of the information that "the girl who owns the BMW" was wearing the stolen locket several days after the robbery. Although Cape May detectives reported to State Police that the victim's mother told them that Brown "was currently in possession" of the locket, they did not say whether the information came from her discussions with her ex-boyfriend, as had her other information, or whether she had some independent source of knowledge.

tell her they would be searching her car the next morning, and she could pick it up afterward.  When she said she was without a ride to Buena where the car was impounded, the investigator offered to pick her up and take her to her car.

When the detectives searched Brown's car, they found crack cocaine, marijuana and heroin, as well as a holster for a small caliber gun, like the ones used in the robbery, and some jewelry.  They immediately decided that the next step in their investigation should be to search Brown's house for additional evidence.  As they were already scheduled to pick Brown up to take her to her car, they drove directly to her home to seek her consent for a search.

The lead investigator and Detective Steet met with Brown just outside her apartment.  The lead investigator testified that Brown refused their request to search her home.  His counsel then asked:

> [Defendants' counsel:]
>
> Trooper, what are you trained to do in this
> situation, where you go to a place, you go
> to an apartment and you ask for consent,
> consent is denied, validly denied?  What's
> your obligation in terms of the training
> you've received through the State Police?
>
> [Lead investigator:]
>
> We have to preserve the scene, to keep the
> integrity of possible evidence, and then we

A-4796-12T3

have to make the application for the search warrant.

The investigator explained in response to further questioning that State Police has "the right to maintain the scene," which includes "entering the residence" when the occupant has refused a request to search supported by probable cause. The detectives testified they gave Brown two options. "[W]e gave her choices to, she could leave. Just lock up the property and give us a key so that when we get the search warrant, we can unlock it." "The other option is if she is insistent in going into her own home, then we would have to accompany her with that time that we're waiting for the search warrant."

Detective Steet testified when Brown "was adamant to say, no I'm going into my own house," the officers followed her inside despite their clear understanding that Brown "didn't want us in that house." The detectives accompanied Brown to the kitchen, telling her "to sit at the kitchen table until we get our search warrant." The detectives remained in Brown's home for several hours, refusing her requests to use her own bathroom unless accompanied by a female officer.

When asked by his counsel why the detectives did not want Brown back in her home alone, the lead investigator testified, "we didn't want her to destroy any evidence. We didn't want her rummaging around the house." When asked whether the detectives

had any specific concern that Brown would destroy evidence, the investigator replied, "if people are possessing things that are stolen, there's always a reason to believe that once they realize that they might be a suspect in possessing that stolen property, that they're going to destroy it or get rid of it." That led to the following exchange:

> [Plaintiff's counsel:]
>
> So anybody that you have reason to believe has evidence, you have reason to believe that they're destroying the evidence. Is that what your testimony is?
>
> [Lead investigator:]
>
> That's absolutely a possibility, yes.

Detective Steet was even clearer about his conclusions. He testified he had no concern about Brown destroying evidence until the detectives made her "aware of the existence of evidence in her home and she insisted in going into her home." The detective explained that in the course of asking Brown's consent to search her home, "[w]e explained exactly what we were looking for when it came to that necklace, the locket with diamonds. . . . She knew we were aware of that existing and that our information was, we believed that she was in possession of it." When asked what facts supported his belief that Brown would destroy evidence, Steet responded:

Her insistence — her — she insisted on going into that home without our presence. That mere fact, for any reasonable person to believe, once they know that that exists, that evidence is going to be gone.

So what she wanted us to do was to just allow her to go into her home, have us leave and go get the search warrant.

We're going to come back with the search warrant some hours later, do the search of the house and that evidence that she's specifically told about is not going to be there.

The lead investigator also testified the detectives had no proof that Brown "was actively destroying evidence" at any time before they asked Brown for consent to search her home. When Brown's counsel asked him whether he had any fear that by asking for consent he would be tipping off the witness, he replied, "No, because if they deny consent, we then are going to make application for the search warrant and now, we're going to maintain control of the integrity of the residence." He further explained that exigent circumstances were not at issue in this case because "that deals with more serious crimes, where someone could possibly, at that very moment, be destroying evidence. Once you're at the house and you have it secured, it — exigent circumstances don't exist."

The detectives' supervisor, the sergeant in charge of the criminal investigation office at the Woodbine station, testified

A-4796-12T3

that the detectives had kept him apprised of the progress of their investigation, and that he was aware they would be seeking Brown's consent to search her home. He testified that if the homeowner denies consent and refuses to "lock and leave," she is free to stay inside her home, but "[w]e stay too." He explained that it was not only "his training and experience" that dictated that course "but logic. We can't allow it to — we can't allow anything to jeopardize the integrity of what's going on inside, once we are now going to take steps to secure a warrant."

When Brown's counsel asked whether it was his "understanding, if the consent is denied, that [State Police has] the right to seize the property," the supervisor replied:

> No, sir. It all depends on what that consent is based upon. If I'm going and asking you for a consent based upon RAS; reasonable, articulable suspicion, and you say no, I've got to walk away because I can't do anything other than ask and . . . hope to gain your permission.
>
> . . . .
>
> If I ask for consent based on probable cause, which is what [the detectives] did that day, and you say no, I have the benefit of having a very good plan B, which would be applying for a search warrant.

When Brown's counsel asked why they had not considered applying for a telephonic warrant, the supervisor replied, "Because I would not have, nor would any other of the

investigating personnel, been able to articulate that we had a reasonable expectation that the evidence would be destroyed or lost." When asked by his own counsel whether applying for a telephonic warrant would have been appropriate after the detectives found the holster and jewelry in the car, the supervisor said, "Absolutely not." When counsel asked why, the supervisor explained, "Because there's no exigency there." Finally, in response to counsel's question about the reason for not applying for a telephonic warrant once the detectives secured the property, the supervisor said, "Because we took away the exigen[t] circumstances." He agreed with his counsel's statement that "[o]nce that property is in the control of [the detectives], . . . there are no exigent circumstances in terms of worrying about the destruction of evidence."

When the officers finally obtained the warrant and searched Brown's home, they did not find the locket they were looking for. The only item listed on the search warrant return was a black Nike backpack similar to the one witnesses reported the robbers carried. The lead investigator testified that although the bags were of the same type, none of the witnesses was able to say the bag found in Brown's closet was the one carried by the robbers.

A-4796-12T3

Our view of this testimony is that it represents a profound misunderstanding of the "narrow scope of the exigent-circumstance exception" to the warrant requirement and establishes beyond any doubt that the detectives' entry into Brown's home violated her rights under Article I, paragraph 7 of the New Jersey Constitution of 1947.[4]  See State v. Lewis, 116 N.J. 477, 484 (1989).[5]

---

[4]  Plaintiff's original complaint alleged violations of her rights under the Fourth Amendment as well as under Article I, paragraph 7.  Defendants removed that complaint to federal court.  Plaintiff subsequently dismissed voluntarily her federal claims and the matter was remanded to state court where it has proceeded under an amended complaint solely under our state constitution.

[5]  Although the Supreme Court made clear it was deciding Lewis under the Fourth Amendment and not under Article I, paragraph 7 on which we had relied, 227 N.J. Super. at 594-95 & n.1, the opinion did not criticize or overrule Judge King's state constitution analysis.  116 N.J. at 489.  Thus, we consider Lewis as representing the Court's view that as to the exigent circumstance exception justifying warrantless entry into a dwelling, the search and seizure safeguards of the federal and state constitutions are coterminous.  See State v. Hunt, 91 N.J. 338, 344 (1982) (noting the "Court has seen fit to hold that the search and seizure provisions in the federal and New Jersey Constitutions are not always coterminous, despite the congruity of the language") (citations omitted).  In no event could we interpret Article I, paragraph 7 to provide Brown less protection from unreasonable searches and seizures than that guaranteed her under the Fourth Amendment.  See State v. Novembrino, 105 N.J. 95, 145 (1987) (noting that "although the language of article I, paragraph 7 of the New Jersey Constitution is virtually identical with that of the fourth amendment, we have held in other contexts that it affords our citizens greater protection against unreasonable searches and seizures than does the fourth amendment").

A-4796-12T3

"[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  United States v. U.S. Dist. Court, 407 U.S. 297, 313, 92 S. Ct. 2125, 2134, 32 L. Ed. 2d 752, 764 (1972).  In State v. Hutchins, 116 N.J. 457, 463 (1989), decided over twenty-five years ago, the Court declared it was "well established that 'searches and seizures inside a home without a warrant are presumptively unreasonable,' Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639, 651 (1980), and hence 'prohibited by the Fourth Amendment, absent probable cause and exigent circumstances.'  Welsh v. Wisconsin, 466 U.S. 740, 749, 104 S. Ct. 2091, 2097, 80 L. Ed. 2d 732, 743 (1984)."

Although whether there was probable cause to search Brown's home is questionable,[6] it is beyond doubt there were not exigent

_____

[6]    Leaving aside the questionable reliability of the source of the information that Brown was wearing the stolen locket, and the likely "echo" of that source in the information provided by his ex-girlfriend, the victim's mother, the information on which the lead investigator relied to secure the search warrant of Brown's home, that the "search of the BMW revealed jewelry that belonged to the victim, minus the [locket]," was not true.  The investigator testified at trial that although they "believed at the time" the jewelry found in Brown's car was stolen in the home invasion, "we showed them to the victim and she couldn't identify them."  The detectives did not attempt to confirm the jewelry found in the car was stolen in the home invasion before deciding they needed to search Brown's house or swearing out an affidavit to that effect in order to secure a search warrant when Brown denied them entry.  Because plaintiff stipulated that
(continued)

circumstances to justify the detectives' warrantless entry, and that whatever exigency existed was solely of the detectives' making. Although the term defies precise definition divorced from the facts of some specific case, "[g]enerally stated, circumstances are exigent when they 'preclude expenditure of the time necessary to obtain a warrant because of a probability that the suspect or the object of the search will disappear, or both.'" State v. Deluca, 168 N.J. 626, 632 (2001) (quoting State v. Smith, 129 N.J. Super. 430, 435 (App. Div.), certif. denied, 66 N.J. 327 (1974)). The Court has recently reiterated that "'[e]xigent circumstances are present when law enforcement officers do not have sufficient time to obtain any form of warrant' because of the immediate and urgent circumstances confronting them." State v. Hathaway, ___ N.J. ___ (2015) (quoting State v. Pena-Flores, 198 N.J. 6, 30 (2009)).

When determining whether exigent circumstances exist, courts consider:

> the degree of urgency and the amount of time necessary to obtain a warrant; the reasonable belief that the evidence was about to be lost, destroyed, or removed from the scene; the severity or seriousness of the offense involved; the possibility that a suspect was armed or dangerous; and the

---

(continued)
the detectives had probable cause to search her home, we do not consider this issue further.

> strength or weakness of the underlying
> probable cause determination.
>
> [State v. Walker, 213 N.J. 281, 292 (2013)
> (quoting Deluca, supra, 168 N.J. at 632-
> 33).]

Applying those factors here, it is plain that exigent circumstances were absent as a matter of law. These troopers were not confronted with any immediate and urgent circumstances, certainly none not of their own making. The detectives had the information that Brown supposedly had the locket within days of the home invasion, well before her boyfriend was arrested driving her BMW. After they were able to impound the car, the detectives waited over a week to apply for a warrant to search it. The detectives testified they had no belief that Brown was destroying or removing evidence, or that she even knew she might possess evidence, until the detectives told her they were searching for the locket. Although the offense the detectives were investigating was a serious one, Brown was not a suspect. And although Brown does not dispute the existence of probable cause, the facts to establish it were not strong. The information that she had the locket came from an individual implicated in the crime and from his ex-girlfriend. No details of any sort were provided. The jewelry found in her car had no link to Brown or to the crime the detectives were investigating.

The detectives' testimony at trial makes clear that they developed their belief that Brown might try and remove or destroy evidence only after they told her of the locket, and she denied their request to search her home for it. For Detective Steet it was Brown's "insistence . . . on going into that home without our presence. That mere fact, for any reasonable person to believe, once they know that that exists, that evidence is going to be gone." The Court, however, has been unequivocal that "[a] homeowner has a right under our federal and state constitutions to insist that a police officer obtain a warrant before entering and searching his house. The assertion of that constitutional right, which protects the most basic privacy interests of our citizenry, is not probative of wrongdoing and cannot be the justification for the warrantless entry into a home." State v. Frankel, 179 N.J. 586, 611, cert. denied, 543 U.S. 876, 125 S. Ct. 108, 160 L. Ed. 2d 128 (2004), modified in part on other grounds by, State v. Edmonds, 211 N.J. 117, 131 (2012) (citations omitted).

As for the detectives' belief that without stopping Brown from entering her apartment without them, "that evidence that she's specifically told about is not going to be there," the law is clear that police-created exigent circumstances arising from unreasonable investigative conduct do not justify warrantless

entry into an individual's home.  Hutchins, supra, 116 N.J. at 460, 474-76; State v. De La Paz, 337 N.J. Super. 181, 196-97 (App. Div.), certif. denied, 168 N.J. 295 (2001) (finding police should have obtained telephonic warrant before entering defendant's home "as there was no obvious urgency requiring their immediate response at the scene").

The only reason the detectives offered for telling Brown about the locket in the course of seeking her consent was the hope she would turn it over voluntarily.  We find it hard to imagine a scenario more unreasonable than the police telling someone not suspected of any crime that the police wish to search her home for specific evidence and, when she declines, claiming their warrantless entry is justified by her possible destruction of the evidence they just revealed to her.  If that were the law, no citizen would enjoy "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  N.J. Const. art. I, ¶ 7.  That scenario would, as it obviously did for these troopers, make a citizen's mere assertion of her constitutional right to insist that a police officer get a warrant before entering her home probative of wrongdoing, an untenable result. See Frankel, supra, 179 N.J. at 611.  Because the "exigent circumstances" the detectives offered as justification for

17                                    A-4796-12T3

proceeding without a warrant were inadequate as a matter of law and were, in any event, impermissibly self-created, they cannot justify the warrantless entry into Brown's home.  See De La Paz, supra, 337 N.J. Super. at 196-97.

The State defendants assert on appeal, as they did at trial, that the detectives did not need exigent circumstances to enter Brown's home while they waited for a warrant.  Relying on Illinois v. McArthur, 531 U.S. 326, 121 S. Ct. 946, 148 L. Ed. 2d 838 (2001), they insist that "plaintiff confuses the concepts of a search based on 'exigency' and simply maintaining the status quo while the warrant is obtained."  We do not find McArthur to be any refuge for the detectives here.

In McArthur, the United States Supreme Court held that police officers did not violate the Fourth Amendment when they prevented a defendant from entering his home for about two hours while the officers obtained a search warrant for the premises. 531 U.S. at 328, 121 S. Ct. at 948, 148 L. Ed. 2d at 846.  They did so after defendant's wife, whom the officers had accompanied to the trailer the couple shared "so that they could keep the peace while she removed her belongings," told the police on her way out that they should check the trailer because her husband "had dope in there" and she had seen him "slide some dope

18                                                    A-4796-12T3

underneath the couch."  Id. at 328-29, 121 S. Ct. at 948-49, 148 L. Ed. 2d at 846.

The Court declined to find "that the warrantless seizure was per se unreasonable" because (1) "the police had probable cause to believe that McArthur's home contained evidence of a crime and contraband, namely, unlawful drugs"; (2) it involved "a plausible claim of specially pressing or urgent law enforcement need, i.e., 'exigent circumstances'"; (3) "the restraint at issue was tailored to that need, being limited in time and scope"; and (4) the restraint that was imposed "avoid[ed] significant intrusion into the home itself."  Id. at 331-32, 121 S. Ct. at 950, 148 L. Ed. 2d at 847-48.

In our view, McArthur cannot fairly be read to eschew the requirement for exigent circumstances for a warrantless entry into a home.  We further find McArthur inapposite for several reasons: (1) the detectives here did not suspect Brown of engaging in any criminal activity; (2) the detectives did not have any reason to believe Brown would destroy evidence before they told her about the locket and no reason specific to Brown as to why she might try to destroy the locket even after they informed her of its provenance; (3) the restraint imposed on Brown was more severe, as the detectives remained in her home

for three and a half to four hours,[7] making no attempt to obtain a telephonic warrant; and (4) the intrusion into her home was greater, there were always at least two officers present, and Brown was not allowed even to use the bathroom unaccompanied by an officer.

A case decided by the Court a year after McArthur, Kirk v. Louisiana, 536 U.S. 635, 122 S. Ct. 2458, 153 L. Ed. 2d 599 (2002), makes clear that the State's argument that police may make a warrantless entry into a home to "secure" it without a showing of exigent circumstances is simply incorrect. In Kirk, police officers who observed the defendant conduct a suspected drug transaction entered his apartment and arrested him ostensibly to prevent the destruction of evidence while they obtained a search warrant for the premises. Id. at 636, 122 S. Ct. at 2458, 153 L. Ed. 2d at 601. The Louisiana Court of Appeal refused to consider Kirk's argument that the police had failed to prove exigent circumstances for their warrantless entry, finding the issue irrelevant because the police had probable cause to arrest Kirk and the charges against him were

---

[7]    The detectives testified that it took about six hours to obtain the warrant, despite that the detective's affidavit in support of the application was largely lifted from the affidavit used to secure the search warrant for the BMW. Brown had to leave for work about three and a half to four hours after the police arrived and thus was not present when the lead investigator returned with the warrant.

based on evidence found on his person, not in the apartment. State v. Kirk, 773 So. 2d 259 (La. Ct. App. 2000), as amended, 2002 La. App. LEXIS 3634 (La. Ct. App.), rev'd, 536 U.S. 635, 122 S. Ct. 2458, 153 L. Ed. 2d 599 (2002).

The Supreme Court reversed and remanded for a determination of whether there were exigent circumstances that would have justified the officers' entry into the apartment, holding that "[a]s Payton makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home. The Court of Appeal's ruling to the contrary, and consequent failure to assess whether exigent circumstances were present in this case, violated Payton." Kirk, supra, 536 U.S. at 638, 122 S. Ct. at 2459, 153 L. Ed. 2d at 603.

Cases decided by lower federal courts since McArthur and Kirk have routinely required a showing of probable cause and exigent circumstances for any warrantless entry into a home regardless of whether to search or simply secure. See, e.g., Harris v. O'Hare, 770 F.3d 224, 238 (2d Cir. 2014) ("Because police officers require 'either a warrant or probable cause plus exigent circumstances in order to make a lawful entry,' Kirk, 536 U.S. at 638, 122 S. Ct. 2458, the invasion of Plaintiffs' curtilage without a warrant violated the Fourth Amendment.");

A-4796-12T3

Rogers v. Apicella, 606 F. Supp. 2d 272, 287 (D. Conn. 2009) ("Whether regarded as a warrantless entry or a 'protective sweep,' this entry was unlawful absent exigent circumstances or consent."); United States v. Christie, 570 F. Supp. 2d 657, 667 (D.N.J. 2008) (noting, "The McArthur Court ultimately held that exigent circumstances justified the warrantless seizure of the defendant's home, especially in light of the appropriately balanced privacy-related and law enforcement-related concerns"), aff'd, 624 F.3d 558 (3d Cir. 2010), cert. denied, 562 U.S. 1236, 131 S. Ct. 1513, 179 L. Ed. 2d 335 (2011). Accord United States v. Watson, 703 F.3d 684, 693 (4th Cir. 2013) ("We are not aware of any Supreme Court case or federal appellate decision permitting a three-hour detention of an occupant of a building who lacks any specific connection to suspected criminal activity, while police obtain a warrant to search that building.").

Although the State defendants contend "that no case decided on the basis of Art. I, Para. 7 presents the same factual setting" as this one, we think the Court's decision in Lewis,[8]

---

[8]   In Lewis, the police received information from an informant that he had seen drugs in the defendant's apartment, that defendant and others were packaging the drugs for immediate distribution and that one of the occupants had a gun. 116 N.J. at 480. The defendant opened the apartment door when a police officer knocked but, seeing the officer's uniform, tried to slam
(continued)

which involved the warrantless entry into a dwelling, more closely analogous to this case than State v. Young, 87 N.J. 132, 144 (1981), on which the State defendants rely in support of their argument that "the New Jersey Supreme Court has recognized law enforcement's ability to effect a temporary seizure of property while seeking a search warrant." Young, however, involved a roadside search of a suitcase taken from the defendant's car, not a warrantless entry into his home. Lewis, on the other hand, makes clear that warrantless entry into a

(continued)
it shut. Ibid. The officer "stuck his foot in the door to keep it open" and, at that point, saw "on the kitchen table, a glass, a gold razor blade, and a clear bottle containing a white powder believed by the officer to be narcotics." Ibid. The police went inside, arrested the defendant, and searched the apartment. Id. at 481.

The Court held the officer's act of putting his foot in the door to prevent the defendant from closing it and retreating into his apartment was unlawful because the informant's report that people in the apartment "were 'getting ready to leave,' thus threatening removal of any narcotics on the premises," was not an exigent circumstance that would justify a warrantless entry, and that the police could have safely secured the apartment by surveilling it from the outside. Id. at 487-88.

Our courts have consistently required both probable cause and exigent circumstances to justify entry into a dwelling. See, e.g., State v. Lashley, 353 N.J. Super. 405, 412 (App. Div. 2002) (noting "the warrantless entry of the dwelling was . . . unlawful in the absence of both probable cause and exigent circumstances"); State v. Holland, 328 N.J. Super. 1, 6 (App. Div. 2000) (noting that the two prongs of the test of the legality of a warrantless intrusion into a residence are probable cause and exigent circumstances), rev'd on other grounds, 176 N.J. 344 (2003); State v. Ulrich, 265 N.J. Super. 569, 572-73 (App. Div. 1993) (same), certif. denied, 135 N.J. 304 (1994).

home is illegal absent consent or probable cause and exigent circumstances. As the Court has lately noted, "a private home is not like a package in transit." State v. Wright, 221 N.J. 456, 476 (2015) (declining under Article I, paragraph 7 to apply the private search doctrine to private dwellings in light of their "preeminent position" under the federal and state constitutions).

Accordingly, having reviewed the testimony in the light most favorable to defendants and having considered all of their arguments, we conclude the trial court erred in submitting this case to the jury because the detectives' own testimony makes clear beyond any doubt that their entry into Brown's residence before securing the warrant violated her rights under Article I, paragraph 7 as a matter of law.[9]

---

[9] Because the State is immune from suit under the Civil Rights Act, the vast amount of testimony and argument directed to whether State Police has a "policy" of warrantless entry under similar circumstances is irrelevant. Any such "policy" would be relevant only to impose liability on the State for Steet's actions, a result barred by the State's immunity. See, e.g., Stomel v. City of Camden, 192 N.J. 137, 145-46 (2007) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611, 635-36 (1978), and Loigman v. Twp. Comm. of Middletown, 185 N.J. 566, 590 (2006)) (explaining the circumstances under which a municipality can be held liable for the civil rights violations of its employees).

That conclusion, however, does not end our inquiry. Brown has sued under the Civil Rights Act, which provides in pertinent part:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.
>
> [N.J.S.A. 10:6-2c.]

The Act was adopted in 2004 "for the broad purpose of assuring a state law cause of action for violations of state and federal constitutional rights and to fill any gaps in state statutory anti-discrimination protection." Owens v. Feigin, 194 N.J. 607, 611 (2008). The Court has noted that although the legislative history is sparse, it "tells us that our State Civil Rights Act is modeled off of the analogous Federal Civil Rights Act, 42 U.S.C.A. § 1983, and is intended to provide what Section 1983 does not: a remedy for the violation of substantive rights found in our State Constitution and laws." Tumpson v. Farina, 218 N.J. 450, 474 (2014). Given their similarity, our courts

apply § 1983 immunity doctrines to claims arising under the Civil Rights Act.  See Gormley v. Wood-El, 218 N.J. 72, 113-15 (2014).

Although not raised by the parties on appeal, the State defendants asserted they were immune from suit under the Civil Rights Act in their answer to the complaint.  Because the State can raise its sovereign immunity at any time and does not waive its immunity through litigation conduct, Royster v. N.J. State Police, 439 N.J. Super. 554, 567-68, 572 (App. Div. 2015), we consider whether it can be sued under the Civil Rights Act.

New Jersey courts "have long recognized that an essential and fundamental aspect of sovereignty is freedom from suit by private citizens for money judgments absent the State's consent."  Allen v. Fauver, 167 N.J. 69, 73-74 (2001).  Our Supreme Court has held that "[c]onsent has required clear and unambiguous legislative expression."  Id. at 74.  Unlike certain other remedial statutes such as the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49, or the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8, both of which include the State in their definitions of "employer," the Civil Rights Act does not on its face apply to the State.

A-4796-12T3

That is perhaps not surprising in a statute modeled on § 1983, which the United States Supreme Court long ago determined did not apply to the states. <u>Will v. Mich. Dep't of State Police</u>, 491 <u>U.S.</u> 58, 67, 71, 109 <u>S. Ct.</u> 2304, 2310, 2312, 105 <u>L. Ed.</u> 2d 45, 55, 58 (1989) (holding that "in enacting § 1983, Congress did not intend to override well-established immunities or defenses under the common law," and, accordingly, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983"). Given that the Legislature did not choose to include an express waiver of sovereign immunity in the Civil Rights Act and that the State enjoys immunity under the analogous § 1983, we conclude that the State is immune from a suit for damages under the Civil Rights Act. The federal courts are in accord. <u>See, e.g.</u>, <u>Didiano v. Balicki</u>, 488 <u>F. App'x</u> 634, 638 (3d Cir. 2012) (rejecting plaintiff's argument that the word "person" should be interpreted differently under the Civil Rights Act than in § 1983).

Likewise, because the State is not a "person" under the Civil Rights Act, it is equally immune from suits for damages as it is for suits seeking injunctions and other equitable relief. <u>See, e.g.</u>, <u>Kentucky v. Graham</u>, 473 <u>U.S.</u> 159, 167 n.14, 105

S. Ct. 3099, 3106 n.14, 87 L. Ed. 2d 114, 122 n.14 (1985) (noting that "a State cannot be sued directly in its own name regardless of the relief sought" unless its sovereign immunity is affirmatively waived or validly abrogated by Congress).[10]

Accordingly, because the State is immune from suit under the Civil Rights Act, we conclude that the trial court did not err in denying Brown's JNOV motion as to the State for damages and injunctive relief, notwithstanding the detectives' violation of Brown's rights under Article I, paragraph 7 as a matter of law.

Finally, we consider whether Detective Steet is entitled to qualified immunity under the Civil Rights Act. The Court has recently addressed the qualified immunity of police officers in Morillo v. Torres, ___ N.J. ___ (2015) N.J. LEXIS 661, *21, *38 (July 13, 2015). There the Court explained that

> [t]he doctrine of qualified immunity shields law enforcement officers from personal liability for civil rights violations when the officers are acting under color of law

---

[10]    Brown has not pursued an injunction remedy against the Superintendent of State Police in his individual capacity, see Ex parte Young, 209 U.S. 123, 154, 28 S. Ct. 441, 451, 52 L. Ed. 714, 728 (1908), as she dismissed her claims against him. Brown alleged in her complaint that Steet was "a policy making Defendant with respect to searches and seizures of citizens." There was, however, no testimony at trial to support that allegation. Steet testified he had been a trooper since 2003. He did not testify to having any supervisory or policy-making authority.

in the performance of official duties. This protection extends to suits brought under 42 U.S.C.A. § 1983 and under New Jersey's analogue, the Civil Rights Act, N.J.S.A. 10:6-1 to -2.

[Id. at *10.]

We apply a two-prong test in determining whether a police officer is entitled to qualified immunity. Id. at *25-*26 (citing Wood v. Moss, ___ U.S. ___, ___, 134 S. Ct. 2056, 2066-67, 188 L. Ed. 2d 1039, 1051 (2014)). "The first inquiry asks whether the facts alleged, '[t]aken in the light most favorable to the party asserting the injury,' show that the challenged conduct violated a statutory or constitutional right." Id. at *26 (quoting Saucier v. Katz, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272, 281 (2001), and Wood, supra, ___ U.S. at ___, 134 S. Ct. at 2067, 188 L. Ed. 2d at 1051). "Second, the court must determine 'whether the right was clearly established.'" Ibid.

"Requiring the alleged violation of law to be 'clearly established' 'balances . . . the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" Wood, supra, ___ U.S. at ___, 134 S. Ct. at 2067, 188 L. Ed. 2d at 1051 (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172

29                                                    A-4796-12T3

L. Ed. 2d 565, 573 (2009)).  Courts have noted that the "dispositive inquiry" on this issue "'is whether it would [have been] clear to a reasonable officer' in the agents' position 'that [his] conduct was unlawful in the situation [he] confronted.'"  Ibid.  (quoting Saucier, supra, 533 U.S. at 202, 121 S. Ct. at 2156, 150 L. Ed. 2d at 281).

Applying that test here, we conclude that Steet is not entitled to qualified immunity.  The detective's own testimony establishes, unequivocally, that his warrantless entry into Brown's home without consent or exigent circumstances violated her rights under our State Constitution, satisfying the first prong.  As to the second prong, the law is well established that even when police have probable cause that a home contains evidence of a crime, they are not permitted to enter the home, or, indeed, put a foot in the door, without exigent circumstances not the product of unreasonable investigative conduct.  Kirk, supra, 536 U.S. at 638, 122 S. Ct. at 2459, 153 L. Ed. 2d at 603; Welsh, supra, 466 U.S. at 749, 104 S. Ct. at 2097, 80 L. Ed. 2d at 743; Lewis, supra, 227 N.J. Super. at 594-95.  Accordingly, as to Detective Steet, we remand for a trial on damages.

Affirmed in part; reversed in part; and remanded for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION