**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0312-18T3

ANTHONY P. FALCO, SR.,

     Plaintiff-Appellant,

v.

DAWN ZIMMER, in her capacity
as Mayor of the City of Hoboken
and individually, the CITY OF
HOBOKEN, a municipal corporation,
and JON TOOKE, in his capacity as
Director of Public Safety for the City
of Hoboken and individually,

     Defendants-Respondents.

_____

Argued October 28, 2020 – Decided  January 7, 2021

Before Judges Sumners, Geiger and Mitterhoff.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-0369-16.

Jason F. Orlando argued the cause for appellant (Murphy Orlando, LLC, attorneys; Jason F. Orlando, John W. Bartlett and Christopher D. Zingaro, on the briefs).

Victor A. Afanador argued the cause for respondent Dawn Zimmer (Lite Depalma Greenberg LLC, attorneys; Victor A. Afanador, of counsel and on the brief; Jonathan M. Carrillo and Francis A. Kenny, on the brief).

Thomas B. Hanrahan and David Pack argued the cause for respondents City of Hoboken and Jon Tooke (Hanrahan Pack, LLC, attorneys; Thomas B. Hanrahan, of counsel and on the brief).

PER CURIAM

This appeal involves political disputes arising from the changing demographics of the city of Hoboken. Plaintiff Anthony Falco, former Chief of Police for Hoboken, sued defendants City of Hoboken, Dawn Zimmer, former Hoboken Mayor, and Jon Tooke, former Hoboken Director of Public Safety, alleging Zimmer and Tooke interfered with his operation of the police department, N.J.S.A. 40A:14-118, and withheld or delayed employment benefits in violation of the New Jersey Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2, and New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. Additionally, Falco asserted common law claims of breach of contract, breach of implied covenant of good faith and fair dealing, and tortious interference with contract.

2

On June 30, 2016, the Law Division judge granted defendants' motion to dismiss with prejudice for failure to state a claim certain counts of Falco's third amended complaint. Two dismissed counts sought damages for alleged violations of the NJCRA because defendants retaliated against him for exercising federal and state rights of free speech by reducing his authority as police chief (count one) and failing to compensate him (count two). A third count, alleged defendants withheld Falco's compensation because he exercised his constitutional right of political expression (count seven).

On September 14, 2016, the court issued a corrective order, partially granting Falco's reconsideration of the June 30, 2016 order. In relevant part, the order reinstated count two to proceed only as to Falco's retirement compensation.

On September 5, 2018, the court entered summary judgment in favor of defendants, dismissing Falco's complaint in its entirety with prejudice. In a separate order that same day, the court barred Falco's expert report.

Falco appeals the following motion court orders: June 30, 2016 – granting dismissal of counts one, two and seven of the complaint; September 14, 2016 – limiting prosecution of count two; September 5, 2018 – granting summary

judgment dismissal of his entire complaint with prejudice; and September 5, 2018 – barring Falco's expert report.

For the reasons that follow, we affirm the orders dismissing Falco's common law contract claims and barring the testimony of his expert, but reverse the orders dismissing Falco's CEPA and NJCRA claims pertaining to the alleged withholding or denial of his benefits.

I.

All the following facts and circumstances are taken from the extensive deposition testimony.

A.

Falco's Appointment as Police Chief and Benefits

In 2008, the State of New Jersey, Department of Community Affairs (DCA), appointed a fiscal monitor, Judy Tripodi, to oversee Hoboken's finances and governance due to fiscal mismanagement that resulted in substantial budget deficits.

On June 18, 2009, Tripodi appointed Falco to serve as the City's Chief of Police at an annual salary of $150,000 plus a $3000 college stipend "absent longevity."  Prior to the appointment, Falco, born and raised in Hoboken, held

the rank of Captain and, as such, was a member of the Hoboken Police Superior Officer's Association (PSOA) collective bargaining unit.

Zimmer, who was a member of Hoboken City Council when Falco was appointed police chief, did not sign the council's letter to the DCA recommending his appointment. Zimmer did not want him to be police chief, according to Falco, who claimed she "harbored animosity towards [him]" because when he was a commander of the detective bureau, he was not able to solve the hit-and-run death of her father-in-law.

Upon Falco's appointment, there was no mention of the benefits he was entitled to receive, nor did he inquire with Tripodi or other Hoboken officials regarding his employment term and benefits, or if he would receive a written employment contract. Falco explained it was not until 2012 that he asked for a written contract, or written terms of employment because he "was receiving everything that [he] was getting."[1] But he asserts he received "no support" from Zimmer's administration regarding his requests.

---

[1] A 2003 compensation agreement for the Hoboken Chief of Police stated the chief "shall receive the same benefits and compensation as those received by members of the [PSOA]" with a few exceptions including, among other items, six extra vacation days, compensation time for hours exceeding a forty-two-hour work week, and up to three years of paid accrued vacation upon retirement. Similar agreements covering "2005-2006-2007" added among other items, that

Although the appointment removed Falco from the PSOA, he believed he was entitled to vacation days and uniform allowance[2] provided to PSOA members because he continued to receive those benefits after his appointment. He also believed he was entitled to longevity based on the past practice that when the PSOA collective bargaining agreement (CBA) expired, benefits would continue until a new agreement was reached. He also claimed he was entitled to "comp time" instead of overtime, as prior chiefs had received, for additional hours worked attributable to Superstorm Sandy's devastation in November 2012. When Falco requested standby time, uniform allowance, and other benefits, Tooke, who was appointed Director of Public Safety in 2011 by Zimmer, told him to inquire with the City's law department regarding his benefits.

Arthur M. Liston, Zimmer's second business administrator and Tooke's predecessor, claimed that Falco, as police chief, was part of management and thus no longer entitled to the PSOA benefits under the CBA, including overtime. He believed Falco was entitled to receive a uniform allowance and sick leave

the chief shall be required to "work those hours necessary to perform his job responsibilities" and set the schedule of raises over a three-year period culminating in the chief having the same base salary as the chief of the fire department.

[2] The record also refers to this benefit as a "clothing allowance." For consistency, we use the term "uniform allowance."

incentive. Falco claimed Tooke told him in 2012 that because he did not belong to a collective bargaining unit, he was not entitled to certain benefits afforded to unit membership such as uniform allowance, standby court time, and sick leave incentive.

In Falco's memos to Tooke and his predecessor Angel L. Alicea between 2010 through 2014, he asserted he was eligible for stand-by court time, uniform allowance, and sick leave incentive for 2009 through 2013. On several of these memos, Tooke crossed out Falco's name and wrote "excluded by contract," "not in CBA," "not included," or "hold til advised."

On January 4, 2012, Tooke emailed Falco denying his request for an attendance stipend for PSOA members who had a single "occurrence" of use of sick time. He also disallowed Falco's request for overtime and uniform allowance as Hoboken's chiefs of police and fire were "exempt" and not entitled to benefits provided by a CBA.

In 2014, Tooke denied Falco's request for standby court time, again because the chief was not a collective bargaining unit member. Tooke knew that Falco and the fire chief did not have employment agreements, only a document setting salary with no mention of benefits.

A-0312-18T3

Falco acknowledged receiving court time benefit of $500 in 2013 and was later given uniform allowance for 2012, 2013, and 2014. He denied receiving the court time payment for 2014, despite records indicating a check for the benefit was issued to him. It was not until after Falco's retirement in the summer of 2014 that Tooke authorized payment for his uniform allowance. Tooke denied that he was ever directed to withhold benefits from, or provide benefits to, Falco because of his federal lawsuit.

In July 2014, Falco retired as police chief because he reached the state's mandatory retirement age of sixty-five. Accordingly, Hoboken Business Administrator Quentin Wiest sent him a July 29, 2014 letter enclosing a retirement check for $153,551.19 representing terminal pay[3] from 2013 and 2014. Thereafter, Falco was sent: (1) a September 10, 2014 letter from Wiest enclosing a check for $104,414.81 representing terminal pay from 2013 and 2014; (2) a November 18, 2015 letter from Wiest enclosing a check for $104,414.81 in recalculated accrued retirement benefits; and (3) a December 30, 2015 letter about retirement benefits including, among other items, a check for plaintiff's previously denied uniform allowance for 2012, 2013 and 2014. Falco

---

[3] Payment covered thirty-nine years of service and vacation pay for seventy-eight days.

said that he returned several checks but eventually cashed them in 2018 after challenging the amounts.

Zimmer believed Falco's time to negotiate ended before accepting the position and that he "didn't legally have a right to a contract." She recalled having a letter sent to Falco stating that the city would not be entering into a written contract with him. She did not recall discussing with her staff how to calculate Falco's vacation time in the absence of a contract if the CBA did not apply to him. She believed Tooke advised her after the fact that, in Tooke's experience, police chiefs did not receive uniform allowances. She was surprised when Falco requested overtime during Superstorm Sandy because he was part of management. She did not recall why he had to wait "months" for his retirement pay or what the specific discussions were about his terminal pay.

On October 23, 2014, Kenneth Ferrante was promoted from lieutenant to police chief.[4] He and the city entered into an employment contract providing that he was not entitled to receive any compensation for longevity, seniority,

---

[4] After Falco retired in 2014, Garcia was appointed acting chief before Ferrante's appointment. While acting chief, Garcia had an employment agreement with the city providing he was not entitled to "any additional reimbursement included" in the CBA between the city and PSOA. However, he was allowed "to continue to accrue vacation time, sick time, terminal leave and longevity" and will "have the same health insurance he received prior to his" acting appointment.

terminal leave, overtime, standby time, court time and preparation, educational incentives or degrees earned, or for perfect attendance. The terminal and vacation pay he had earned during his tenure as a Hoboken police lieutenant were paid out upon his becoming chief.[5]

## B.
## Zimmer's Mayoral Election

A few months after Falco's appointment as chief, Peter Cammarano defeated Zimmer in the mayoral run-off election by a slim 120 votes. Cammarano resigned a few weeks later after he was arrested for taking a bribe in exchange for promising development rights. Zimmer became acting mayor. She was later elected mayor a November 2009 special election.

Zimmer claimed that she did not know that Falco supported Cammarano for mayor until this litigation. Zimmer was reelected mayor in November 2013.

## C.
## Falco's Differences with Zimmer & Her Administration

1. Police Department Layoff Plan

---

[5] Ferrante, who had worked on Zimmer's reelection campaign, and the City, amended his contract to restrict him from participating in local elections because his wife, also employed by the City, was running for Assembly at Zimmer's suggestion.

Within several months of her November 2009 election as mayor, Zimmer proposed a plan of laying off eighteen police officers and demoting nineteen senior police officers based upon a State audit. She stated she asked Falco, along with business administrator Liston and public safety director Alicea, to review the audit and recalled discussing it with Falco. The "layoff goals" were achieved through retirements. She further recalled the State's fiscal monitoring ended about a year after she became mayor, and irrespective of the State's plans, she reviewed the entire city administration with an eye towards becoming more cost-efficient. Other than the layoff plan that Falco opposed, she could not recall any "major disagreements" with him.

The police unions, PSOA and the Patrolmen's Benevolent Association (PBA), campaigned against Zimmer's plan using flyers, press releases, and television commercials.[6] They believed Zimmer's proposed cuts were "motivated by personal and political animosity" towards them for supporting Cammarano.

---

[6] In a press release, an attorney for the "Hoboken PBA and PSOA" issued a seventeen-point response to Zimmer's "layoff and demotion plan" that contradicted information presented by the Mayor's office. A flyer stated: "Mayor Dawn Zimmer wants to kill 37 police jobs and FIRE EIGHTEEN COPS…even though Hoboken has a $20 Million Budget SURPLUS."

Falco complained that Zimmer and her administration, as well as the State, never solicited his advice regarding the police department's staffing. He publicly opposed Zimmer's layoff plan because he thought it "would be detrimental to the public safety of every resident, every commuter[,] and everyone that visited the City of Hoboken." Falco contended his counterproposal, opposed by Zimmer, to cut $1.3 million from the police department's budget without layoffs or demotions.

In Liston's opinion, the police department needed streamlining but not to the level recommended by the audit report.[7] He explained Zimmer pushed for cost reductions, not necessarily layoffs.

The State approved the layoff plan in August 2010. Ultimately, there were no layoffs but there were twelve demotions. However, all the demoted officers were eventually promoted again.

2. Police Department Operations

As police chief, Falco managed the day-to-day-operations of the police department without the interference of the "appropriate authority" who oversaw the departments. N.J.S.A. 40A:14-118. He understood that the mayor was the

---

[7] Liston had prior experience as a police officer, chief of police, township business administrator, and township manager.

"appropriate authority," but believed the responsibility was usually delegated to the business administrator. He was not aware whether the mayor delegated the duty to Tooke, who, when Falco retired in 2014, was signing off on his payroll, benefits, and expenses.

Zimmer claimed that as mayor, she did not supervise the police department because that was the chief's job. She recalled issuing the general order making herself the "appropriate authority," in February 2011, but did not recall what prompted its issuance; Liston was later made the appropriate authority as business administrator. [8]

In a memo dated April 2, 2011, Falco detailed his denial of then-public safety director Alicea's OPRA requests for department rollcalls for 2010 and for internal affairs investigations, along with his belief that the requests interfered with the day-to-day operations of the police department; Falco had notified "the past two law directors and the current one" of this interference.

In May or June of 2010, Falco wrote a letter to Hudson County Prosecutor Edward De Fazio regarding Alicea's "numerous requests" for internal police records that he believed were confidential  He wrote: "I am respectfully

---

[8] The general order stated that "the Appropriate Authority promulgates rules, regulations and policies for the police and fire divisions through the issuance of General Orders."

requesting that you review the enclosed memos and render an opinion regarding the [public safety] director's request for said documents. I will abide by your decision."

In a June 29, 2010 letter, Assistant Prosecutor Thomas J. Carroll replied, stating "the recording, maintenance[,] and monitoring of the daily attendance records of individual officers is the responsibility of the Chief of Police." The letter also stated that Alicea may be provided with "information as to the number and rank of officers assigned to specific duties on each tour, without identifying the individual officers involved."

In an April 2, 2011 memo, Falco detailed his denial of Alicea's Open Public Records Act (OPRA) requests for department rollcalls for 2010 and for internal affairs investigations, along with his belief that the requests interfered with the day-to-day operations of the police department. Falco recalled notifying "the past two law directors and the current one" of this interference.

Tooke was aware of Falco's "complaints" to the county prosecutor about interference with the police department; he did not recall if he communicated any of those complaints to Zimmer. Tooke believed Falco was entitled to make a complaint. Zimmer stated she only became aware of Falco's request to the county prosecutor through this litigation. She had no recollection that Alicea

requested police department records and denied having any supervisory authority over the police department or Falco.

Falco also charged that when Captain Edelmiro Garcia was serving as acting chief in his absence, Alicea tried to obtain internal police records from Garcia. Garcia rebuffed the request, advising Alicea he could be disciplined for doing so.

### 3. St. Patrick's Day Parade

Contending the annual St. Patrick's Day parade became fraught with public safety concerns, Zimmer presented plans to either cancel or move the parade from a weekday to the weekend.[9] According to Falco, after Zimmer sought his input, she then excluded him from the parade committee meeting. Falco spoke out publicly, opposing Zimmer's plans. Believing the parade was a "religious type of celebration," he spoke out against the mayor's plans at his church, Our Lady of Grace Congregation.

### 4. Falco's Testimony in Favor of Alicea's Lawsuit

---

[9] Falco denied that two rapes allegedly occurred on or near parade day and did not recall discussing the purported incidents with Zimmer.

A-0312-18T3

In 2011, Alicea sued Zimmer and Hoboken for wrongful termination, discrimination, and defamation following his termination.[10] At trial, Falco, while still employed as police chief, was subpoenaed to testify on Alicea's behalf concerning the working environment at city hall and the divisions in the City between "old" and "new" Hoboken. Zimmer and her supporters were considered "new Hoboken" for recently migrating to the City while Falco and Alicea were viewed as "old Hoboken" for having been raised or lived in the City for many years. Alicea described Falco's testimony as "truthful" and favorable to his case. On December 18, 2103, the jury awarded more than a million dollars in damages to Alicea. The case was later settled.

D.
Alleged Retaliation

Falco deposed that Zimmer "retaliated and harassed" him when she interfered with a helicopter crash investigation by asking him to release the victims' names, pressured him to do certain things, and disregarded his recommendations. He believed Zimmer did not want him to be police chief. In sum, he asserted that "she retaliated against me because of my political support, my religious support, going more or less whistle blowing to the prosecutor's

_____

[10] Alicea was accused of lying to city officials regarding a meeting he had with a federal government informant.

office and to Kleinman about the harassment and the interference, also my . . .

daughter's arrest of [Ian] Sacs,[11] [and] my testimony in [favor of] Alicea."

E.
Falco's Federal Lawsuit

Almost three years before filing this lawsuit in January 2016 and while

still serving as police chief, Falco filed a similar action alleging federal and state

claims against the same defendants in the United States District Court, District

of New Jersey. Following numerous motions and amended pleadings the district

court eventually granted the defendants' Fed. R. Civ. P. 12(b)(6) motion to

dismiss with prejudice Falco's First Amendment retaliation and Fourteenth

Amendment due process violations. Falco v. Zimmer, 767 F. App'x 288, 295

---

[11] Ian Sacs, a Zimmer appointee to the position of Director of the Parking Authority, was arrested by Falco's daughter, a Hoboken police officer, for fighting with a parking utility employee who had left a "Hop Bus" running unattended in front of a store. Falco denied having any involvement with the decision to charge Sacs with a disorderly persons offense for driving the bus (a commercial vehicle) without a license. He claimed to have learned of the arrest when Zimmer called him to ask why her parking director was in handcuffs and arrested. Falco had no recollection of talking to his daughter the day of Sacs's arrest.

A-0312-18T3

(3d Cir. 2019).[12] The district court declined to exercise pendant jurisdiction over Falco's state law claims.

In an April 11, 2019 unpublished decision, the Third Circuit Court of Appeals reinstated Falco's First Amendment retaliation claims. Id. at 292-93. The court held that the district court erred in "articulating and applying the relevant legal standard to Falco's First Amendment retaliation claims, but did not err in assessing Falco's procedural due process claims." Ibid.

The Third Circuit analyzed whether Falco was acting as a private citizen or a public employee for the purposes of each of his acts of alleged protected speech. Id. at 299-304. Public employees making statements pursuant to their official duties are not insulated under the First Amendment.

> If, however, the speech (1) is not part of his ordinary job duties or is uttered as sworn testimony in a judicial proceeding, (2) involves a matter of political, social, or other concern to the community, and (3) the government's interest in promoting the efficiency of its services is not significantly greater than the employee's interest in speaking about the matter and the value to the community of his being able to do so, then the speech is protected under the First Amendment.
>
> [Id. at 304.]

---

[12]  We cite this case for the sake of completeness, noting that although cases reported in the Federal Appendix, they are not published and, therefore, do not constitute precedent. R. 1:36-3.

The court reasoned that "only three of Falco's offered activities--"(1) his vocal support for opponents of Zimmer in 2009, 2010, 2011 and 2013; (2) his filing the instant lawsuit in March 2013; and (3) his testimony in Alicea['s lawsuit] in December 2013"-- are protected by the First Amendment." Id. at 310. The court concluded it was reasonable to infer that defendants were aware of these three protected activities and that the denial or delay of benefits occurred in sufficient proximity to the activities. Id. at 314. Therefore, Falco's claim that the denial or delay in giving him various benefits in 2012, 2013, and 2014 constituted "retaliatory acts for which his First Amendment protected activities were a substantial or motivating factor" survived dismissal. Id. at 313-15.

After declining to consider discovery obtained from this state court litigation, the court concluded Falco waived his claims of protected political association "in the operative fourth amended complaint" and declined to review it. Id. at 296-298, 300. Falco's allegations of interference in his day-to-day responsibilities as police chief were declared to be de minimis because "interference by filing formal inquiries and requests more akin to 'petty slights, minor annoyances, and simple lack of good manners,' . . . are not actionable in an analogous legal context." Id. at 312 (quoting Burlington N. & Santa Fe Ry.

Co. v. White, 548 U.S. 53, 68 (2006)).  Falco's other claims remained dismissed.[13]  Id. at 310.

## II.

We review a ruling on a summary judgment motion de novo, applying the same standard governing the motion court.  N.J. Transit Corp. v. Certain Underwriters at Lloyd's London, 461 N.J. Super. 440, 452 (App. Div. 2019) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).  A motion judge should grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."  R. 4:46-2(c).  In deciding whether a genuine issue of material fact exists, "the motion judge must 'consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.'"  Green v. Monmouth Univ., 237 N.J. 516, 529 (2019) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).  However, this court

---

[13]  At oral argument before us, the parties advised the federal litigation is pending before the District Court.

owes "no deference to the motion judge's conclusions on issues of law." Bove v. AkPharma Inc., 460 N.J. Super. 123, 138 (App. Div. 2019) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). We consider these principles when addressing Falco's arguments to overturn the motion court's rulings.

## A.
## CEPA claims

Falco contends the motion court erred in granting summary judgment on his CEPA claim. He argues that he disclosed to his superiors and the county prosecutor "that Zimmer and her administration were interfering in the day-to-day operations of the police department" contrary to N.J.S.A. 40A:14-118. He contends his public allegations about defendants' behavior and the risks it posed to the public health, safety, or welfare were made in his federal lawsuit, his testimony in Alicea's wrongful termination suit, and his opposition to Zimmer's police department layoff plan. He further argues the record demonstrates a "clear causal nexus" between his protected acts and the retaliatory nature of defendants' workplace harassment and withholding of his benefits. We favor Falco's position.

CEPA "protect[s] and encourage[s] employees to report illegal or unethical workplace activities and . . . discourage[s] public and private sector

A-0312-18T3

employers from engaging in such conduct." Yurick v. State, 184 N.J. 70, 77 (2005) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). As a remedial statute, CEPA should be liberally construed to effectuate its social goal of protecting employees from retaliation when they report workplace misconduct. Lippman v. Ethicon, Inc., 432 N.J. Super. 378, 380 (App. Div. 2013). The law prohibits an employer from taking any retaliatory action against an employee where the employee does any of the following:

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or
>
> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation . . . .
>
> [N.J.S.A. 34:19-3.]

To establish a prima face case under CEPA, a plaintiff must prove four elements: (1) the plaintiff reasonably believed that the employer's conduct violated "either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy"; (2) the plaintiff "performed a 'whistle-blowing' activity"; (3) the plaintiff experienced an adverse employment action; and (4) "a

causal connection exists between the whistle-blowing activity and the adverse employment action." Yurick, 184 N.J. at 78 (citation omitted).

A CEPA plaintiff need not show that the employer actually violated the law, only that the plaintiff reasonably believed that the employer was violating a law or a clear mandate of public policy. Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003) (citation omitted). In considering plaintiff's attempt to meet this standard, we look to the nature of the police department and Falco's role in the organization.

N.J.S.A. 40A:14-118 provides for the creation and establishment of a municipal police force and sets the powers and duties of the police chief. The police chief "shall be directly responsible to the appropriate authority for the efficiency and routine day to day operations" of the police force. Ibid.

In his letter to the county prosecutor, Falco sought advice as to whether Alicea's request for police officers' personal roll calls and attendance records overstepped his authority. Falco claims this caused adverse employment action by the withholding of his benefits. In granting summary judgment, the court ruled there was no whistleblowing under CEPA. The court found that Falco's letter to the prosecutor about policies and procedures of the city's administration was "merely" a request for an advisory opinion. In addition to that

23

correspondence, Falco also cites his federal lawsuit and his testimony in Alicea's lawsuit as whistleblowing activities. The court did not address these two CEPA allegations. Viewing Falco's allegations in the light most favorable to him, we conclude that he satisfied the first two elements of CEPA.

Falco's letter to the prosecutor was a whistleblowing activity under N.J.S.A. 34:19-3(a)(1). Falco's letter questioned whether his employer's conduct was contrary to a law, rule, regulation, or clear mandate of public policy. He challenged his employer's conduct in his federal lawsuit and trial testimony in Alicea's lawsuit. The motion court's cursory rejection that the letter to the prosecutor was not whistleblowing does not address several of the disputed facts related to this issue and did not view such facts in the light most favorable to the non-moving party, Falco. First, there is a question as to whether Alicea, as the Public Safety Director at the time of the requests, was the "appropriate authority" to which Falco would have been required to be responsible in his position as the chief of police. N.J.S.A. 40A:14-118. Second, in rejecting the letter to the prosecutor as a request for guidance, the court did not address Falco's other claims related to Alicea's attempts to obtain information he believed was confidential. This includes Alicea's attempts to obtain the information from Garcia during Falco's absence, and Falco's

communication of his objections to the city's attorney prior to writing the letter to the prosecutor.

Moreover, the court did not fully address the other two elements of the CEPA claim: whether Falco experienced an adverse employment action and whether a causal connection existed between the whistle-blowing activity and the adverse employment action. With no analysis, the court merely stated Falco "present[ed] . . . [no] proofs that there is a causal connection between his alleged whistleblowing activity in adverse employment action." Under our summary judgment standard, Falco satisfied these two elements to survive dismissal of his complaint. He asserts adverse employment action occurred after Alicea's tenure as Public Safety Director ended in 2011, when the city denied or withheld his benefits for sick leave incentive, uniform allowance stipends, stand-by court time, and terminal pay because of his whistleblowing activities. In reversing we do not suggest that defendants withheld or denied Falco's benefits. We simply hold that there are material disputed facts in the record as to whether defendants denied or withheld benefits Falco should have received due to his whistleblowing activities. He should be permitted to present these claims at trial.

A-0312-18T3

As for the CEPA claim related to the St. Patrick's Day Parade, Falco's opposition to Zimmer's plans to move the day of the parade or cancel it outright, was not an accusation that her actions violated the law or some public policy. Thus, the CEPA allegations related to the parade were properly dismissed.

B.
NJCRA claims

Falco contends the motion court erred in granting summary judgment dismissal of his NJCRA claims. Falco argues he showed that defendants' denial of his benefits and harassment were the result of exercising his rights to free speech and political association. Again, we favor Falco's argument, concluding the court misapplied the law.

The NJCRA in pertinent part states:

> Any person who has been deprived of . . . any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.
>
> [N.J.S.A. 10:6-2(c).]

Thus, the NJCRA provides a cause of action to any person who has been deprived of any rights under either the federal or state constitutions by a

26

"person" acting under color of law. Ibid. It "is not a source of rights itself." Lapolla v. Cnty. of Union, 449 N.J. Super. 288, 306 (App. Div. 2017) (citation omitted). By its terms, "[t]wo types of private claims are recognized under this statute: (1) a claim when one is 'deprived of a right,' and (2) a claim when one's rights have been 'interfered with by threats, intimidation, coercion or force.'" Ibid. (quoting Felicioni v. Admin. Office of the Courts, 404 N.J. Super. 382, 400 (App. Div. 2008)).

The NJCRA, modeled after the Federal Civil Rights Act, 42 U.S.C. § 1983, affords "a remedy for the violation of substantive rights found in our State Constitution and laws." Brown v. State, 442 N.J. Super. 406, 425 (App. Div. 2015) (quoting Tumpson v. Farina, 218 N.J. 450, 474 (2014)). The NJCRA has been interpreted by our Supreme Court to be analogous to Section 1983; thus, our courts apply federal law's immunity doctrines to claims arising under the NJCRA. Perez v. Zagami, LLC, 218 N.J. 202, 213-15 (2014); Gormley v. Wood-El, 218 N.J. 72, 113-15 (2014).

The motion court placed significant emphasis on the federal district court's Rule 12(b)(6) dismissal of plaintiff's complaint. However, the district court's dismissal of Falco's First Amendment claims was reversed by the Third Circuit. We find the reversal instructive even though the Third Circuit was deciding the

correctness of a motion to dismiss for failure to state a claim, and the matter presented to us involves a summary judgment motion. As noted above, the court therefore reinstated Falco's claim that his First Amendment rights were violated due to his political opposition to Zimmer, his federal lawsuit, and his trial testimony for Alicea, which resulted in denial or delay of his benefits. Falco, 767 F. App'x at 310.

"[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." Connick v. Myers, 461 U.S. 138, 145 (1983) (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913 (1982)). "A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." Baldassare v. State of N.J., 250 F.3d 188, 194 (3d Cir. 2001). Accord Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). But the First Amendment only affords protection if the employee speaks "as a citizen on a matter of public concern." Id. at 418. In Garcetti, the United States Supreme Court held that if a public employee is not speaking as a citizen, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Ibid. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution

does not insulate their communications from employer discipline." Id. at 421.

There were sufficient facts to deny summary judgment dismissal of Falco's First Amendment retaliation claim. His testimony in Alicea's civil action and the allegations in his federal lawsuit are protected speech because he was acting as a private citizen, not as a public official. As for his claim that he opposed Zimmer's mayoral candidacy, we conclude there is a factual dispute as to whether he spoke as a private citizen or public official. Falco can therefore present his allegations to the factfinder that defendants denied or delayed his benefits in retaliation for his exercise of those protected activities.

We briefly comment on Tooke and City of Hoboken's argument that Falco's free speech claims under NJCRA are barred by CEPA's waiver provision. The CEPA waiver provision applies to preclude substantially related claims of retaliation raised under common law or other statutory remedies. N.J.S.A. 34:19-8; Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 102-103 (2008) (explaining that in enacting CEPA, the Legislature intended for it to contain a "statutory provision that deems the filing of a CEPA complaint to be an election of remedies"). In short, "[b]y pursuing a CEPA claim, a plaintiff waives any alternative remedy that would otherwise have been available for the same retaliatory conduct, although not at the expense of pursuing other causes of

action that are substantially independent of the CEPA claim." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 556 n.9 (2013).

On June 30, 2016, in resolving defendants' request to dismiss Falco's complaint for failure to state a claim, the motion court declined to apply the CEPA waiver provision at that time based on Falco's argument that he was permitted to "choose his remedies (i.e. whether to proceed under CEPA or under his other retaliation claims) after conducting discovery." Maw v. Advanced Clinical Communications, Inc., 359 N.J. Super. 420, 441 (App. Div. 2003), rev'd on other grounds, 179 N.J. 439 (2004) (explaining that "[c]ommon-law claims of wrongful discharge in violation of public policy, which merely duplicate a CEPA claim, are routinely dismissed under CEPA's exclusivity provision, albeit, generally at later stages of the litigation.") (uncollated materials, June 30, 2016, statement of reasons, p.50). Since the court orders being appealed do not address the applicability of the CEPA waiver, the issue is not before us. That said, given our reinstatement of Falco's NJCRA and CEPA claims and remand, we leave it to the trial court to determine if he continues his CEPA claim whether he must waive his right to remedies available under his NJCRA claim.

## C.
### Contract Claims

A-0312-18T3

Falco contends the motion court erred in dismissing his contract claims, arguing that contrary to the court's determination there was evidence of an employee/employer relationship between him and Hoboken that created a contract. He contends that the court's "cursory analysis," without citing legal precedent, was in error and that both counts had "ample evidentiary support" in the record. We disagree.

There is no question that when Falco was appointed to the position of police chief by the fiscal monitor, he did not execute a contract covering the terms and conditions of his employment. His contention that the CBA between the city and the PSOA provided him benefits is misplaced. Article 1, Section 1 of the CBA states that the PSOA is "the exclusive representative and bargaining unit for all supervisory positions within the Hoboken Police Department . . . holding the rank of Sergeant, Lieutenant and Captain." Clearly, it does not cover the chief of police position.

In addition, there is no support in the record for Falco's contention that he had an implied contract with the city affording him the benefits that he received during the first three years of his tenure as police chief. As a public employee not covered by an individual contract or CBA, Falco's employment was controlled by state law or municipal ordinance. Walsh v. State, 290 N.J. Super.

1, 15-16 (App. Div. 1996) (Skillman, J., dissenting) (quoting Espinos v. Twp. of Monroe, 81 N.J. Super. 283, 288 (App. Div. 1963)), rev'd on dissent, 147 N.J. 595 (1997) ("[T]he relationship between . . . public officials and the agencies appointing them[] 'is not ipso facto contractual in character,' but is instead controlled by the statutes pursuant to which the public official has been appointed."). Although state law addresses the removal or suspension of a police officer, N.J.S.A. 40A:14-147, and the starting salary of a police chief, N.J.S.A. 40A:14-179, neither statute creates a contract as Falco argues. Hence, summary judgment dismissal of Falco's contract claims was appropriate.

## D.
### Attorney Fees

In light of our reinstatement of Falco's NJCRA and CEPA claims, should he prevail on either of those claims, he would be entitled to an award of reasonable attorney's fees in accordance with the governing law.

## III.

Falco argues the motion court erred in barring his expert, Raymond J. Hayducka, Jr., from testifying at trial, or submitting into evidence his two expert reports without conducting a N.J.R.E. 104 hearing. His first report concluded that: (1) Zimmer "improperly took away and denied compensation, which . . . Falco was entitled to"; (2) Falco "received less benefits than his subordinates";

A-0312-18T3

(3) Falco "received disparate treatment related to his compensation and benefits" in light of Zimmer's subsequent award of timely contracts to an interim and permanent chief after Falco's retirement; and (4) Falco "was retaliated against for his testimony in the matter of Alicea v. Hoboken, supporting averse political candidates to . . . Zimmer, and not supporting . . . Zimmer's layoff plan." After reviewing additional discovery, Hayducka issued a second report indicating his initial opinion was strengthened.

We agree with the court that Hayducka's reports did nothing more than provide his personal opinion that it is common practice for police chiefs to negotiate a contract and certain benefits, and that Falco was retaliated against for his testimony against the city and for his political opposition to the mayor. Hayducka did not provide the "why and wherefore" for his opinions. State v. Townsend, 186 N.J. 473, 494 (2006) (quoting Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002)). Hayducka's personal opinion is not a reliable basis for allowing him to provide expert testimony. Rubanick v. Witco Chemical Corp., 242 N.J. Super. 36, 65 (App. Div. 1990) (Havey, J., dissenting). The court did not abuse its discretion in barring Hayducka's testimony or submission of his reports. Townsend v. Pierre, 221 N.J. 36, 52 (2015).

To the extent we have not specifically addressed any issues raised by the parties, we find them to be without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

We affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

34

A-0312-18T3